**People of the State of Illinois, Plaintiff-Appellant, v. Edgar Chaffin, Defendant-Appellee.**

**Gen. No. 52,958.**

First District, Third Division.

May 22, 1969.

Rehearing denied December 18, 1969.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Matthew J. Moran, Assistant State's Attorneys, of counsel), for appellant.

Coghlan, McGloon, Joyce and Murphy, of Chicago (James L. Coghlan and William J. Nellis, of counsel), for appellee.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

The defendant, Edgar Chaffin, was indicted and tried for the murder of Thomas Westbrook. During Chaffin's jury trial the State's motion for a mistrial was granted over his objection. When his case, which was reassigned to the judge from whom this appeal is taken, was called for trial he asked to be discharged on the ground that his trial had been improperly terminated, that he had been in jeopardy and that this barred his prosecution. Ill Rev Stats 1967, c 38, § 3–4(a)(3). The court granted his petition and ordered him discharged. It is from this order that the State appeals.

The testimony heard at the abbreviated trial disclosed that in the early morning of February 25, 1967, a friend

who had been driving two men home from work asked Chaffin to drive them the remainder of the way. Chaffin agreed and the men, James Slajchert and Donald Gardner, entered his car. They lived in Blue Island, as did Westbrook. Chaffin told them that Westbrook had cheated him, that he was going to get even and asked Slajchert where Westbrook's house was located. He displayed a gun and said he intended to kill Westbrook. They drove to Westbrook's house but it was dark and they left.

As they rode on Slajchert noticed two girls in a restaurant whom he knew, and the auto stopped so that he could speak to them. Westbrook was in the restaurant and Slajchert reported this to Chaffin. Chaffin told Slajchert to send Westbrook out on the pretense that he would pay him some money he owed him. Slajchert re-entered the restaurant and delivered the message. Westbrook left the restaurant and Slajchert remained inside. Westbrook approached the car saying that he heard Chaffin had some money for him. Chaffin said that he had, pulled his gun and shot him three times. Chaffin and Gardner drove on but Gardner, who had met Chaffin and Slajchert the first time that night, got out of the car a block or two away.

Westbrook staggered back into the restaurant and collapsed on the floor. Police officers arrived in a few minutes and spoke to him briefly. After speaking to him they approached Slajchert who was sitting in a booth. Westbrook was taken to a hospital where he died two days later.

In addition to this testimony, certain other background information will be helpful in understanding the circumstances which led to the declaration of a mistrial:

> 1. Chaffin and Slajchert were indicted; Gardner was not. The assistant State's attorney informed the jurors that Slajchert and Gardner would testify for the State and that neither would be prosecuted.

3

2. When the police spoke to Westbrook in the restaurant he told them that he had been shot by Chaffin. He said that they should ask Slajchert about it—that Slajchert was sitting in one of the booths.

3. Shortly after he arrived at the hospital Westbrook gave the police a statement which was reduced to writing and signed by him. The written statement repeated in greater detail what he had said at the restaurant.

4. Before the trial started Chaffin's attorney moved to suppress the inculpating statements made by Westbrook. He also requested an order upon the State not to offer the statements in evidence or to refer to them during the trial. The statements did not qualify as dying declarations and the State did not object to the motion or the order.

5. In his opening statement Chaffin's attorney told the jury that Chaffin did not shoot Westbrook. He said: "I am not saying that Gardner is the one who shot the deceased. I do not know. I believe the evidence will disclose that this boy [Chaffin] did not and that Gardner knows who did . . . ."

After Gardner had testified for the State, Slajchert was called to the stand. During his cross-examination the following took place:

Chaffin's attorney: "Officer Pizza came into that restaurant and he had a conversation with Thomas Westbrook, did he not?"

Slajchert: "I don't remember."

Chaffin's attorney: "And then he came over to the table and said 'Where is Slajchert' or 'Who is Slajchert?' did he not?"

Slajchert: "I don't remember whether it was asked by Sergeant Pizza or not. I think it was another officer."

4

Chaffin's attorney: "A police officer came up to the table and said, 'Where is Slajchert' did he not?"

Slajchert: "He said, 'Who is Slajchert?'"

Chaffin's attorney: "'Who is Slajchert' and you identified yourself then for the first time, is that right?"

Slajchert: "Yes."

The State did not object to the cross-examination but shortly thereafter, in chambers, moved for a mistrial. The State contended that the questions and answers raised an inference that Westbrook told the officer that Slajchert shot him. In the alternative, the State argued that it should be permitted to rebut the inference by the introduction of Westbrook's signed statement. The trial court agreed that without some explanation the inference to be drawn from the questioning was that Slajchert did the shooting. The court said, "Under these circumstances it looks like he [Westbrook] said, 'There is the guy that did it, Slajchert.'"

The court inquired whether there was some way to circumvent the misleading inference without introducing the signed statement. It suggested that the inference would be eliminated if both sides would agree to put in evidence what Westbrook said at the restaurant. The defendant's attorney said he would agree to the following: "The cops came in and said to Westbrook, 'What happened' and he said, 'Ask Jim Slajchert, he knows about it.'" The attorney also offered to have the jury instructed that the officer asked, "What happened?" or "Why did he shoot you?" and Westbrook replied, "Ask Jim Slajchert." The State objected and the court agreed that neither suggestion obviated the inference.

Finally, after much debating by the attorneys, the court said that there was no point in belaboring the matter. The defendant's attorney then said that he would stipulate that: Slajchert did not shoot Westbrook, the defense

5

did not contend that he did and did not imply in any manner that Westbrook said that Slajchert shot him. The prosecutor replied that he could not enter into any stipulation because the harm had been done. The court stated that the parties were at an impasse and that a mistrial would be declared.

The judge and attorneys returned to the courtroom. There the defendant's attorney objected to the mistrial and said he would stipulate to everything that was said by Westbrook in the restaurant. After this statement, the attorneys continued to argue but the court interrupted, stating, "I indicated what my decision will be and there is no reason for any further insults between counsel." The jury was called to the courtroom, one of the jurors was withdrawn and a mistrial declared.

The opening statement of Chaffin's attorney obviously implied that if Gardner did not kill Westbrook, Slajchert did. This, followed by the suggestion that police officers talked to the mortally wounded Westbrook and then immediately asked, "Who is Slajchert?" intensified the implication. The questions asked by Chaffin's attorney were unfair and unnecessary. They were unfair because the attorney, having suppressed Westbrook's oral statement, not only knew that Westbrook had accused Chaffin of shooting him but also knew that the State would be unable to refute the inaccurate inference which could be drawn from his questions. They were unnecessary because their only legitimate probative value was to show that Slajchert remained silent until accosted by the police. This could have been done without referring to the conversation between Westbrook and the police or by asking Slajchert questions which carried no accusatory imputation.

The State's case was greatly damaged through no fault of its own and a mistrial appeared to be in order. The trial court made a substantial effort to resolve the difficulty by repeatedly urging the attorneys to reach an

agreement which would do justice to both sides, but they refused to cooperate. Chaffin's attorney was determined to keep his advantage and would only stipulate to a version of the Westbrook conversation which retained the unfavorable inference. The assistant State's attorney was equally adamant; he maintained that the admission into evidence of Westbrook's signed statement was the only way to remove the inference. The court tried to evolve a compromise centering around the oral statement. When no compromise was forthcoming the court observed that further discussion was useless. At this juncture the defense attorney altered his position decidedly. When he saw that the court was ready to declare a mistrial he made two proposals either of which would have remedied the damage to the State's case. The first was to stipulate that Slajchert did not shoot Westbrook and the second was to admit into evidence the entire oral statement Westbrook made to the police. The State rejected both suggestions.

■ ■ A court may declare a mistrial when there is manifest necessity for such an act or the ends of public justice would otherwise be defeated. The decision to declare a mistrial rests within the discretion of the trial court and is not subject to review unless there has been an abuse of that discretion. United States v. Perez, 9 Wheat 579, 6 L Ed 165 (1824); People v. Laws, 29 Ill2d 221, 193 NE2d 806 (1963); People v. Thomas, 15 Ill2d 344, 155 NE2d 16 (1958).

Section 10, article II of the Constitution of Illinois states that: "No person shall . . . be twice put in jeopardy for the same offense." The fifth amendment to the Constitution of the United States provides that: ". . . nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; . . . ." In People v. Friason, 22 Ill2d 563, 177 NE2d 230 (1961) the court said:

**7**

"While a wide variety of circumstances have been held to justify a mistrial without giving rise to a claim of double jeopardy . . . the constitutional guaranty against double jeopardy is a substantial one deeply ingrained in Anglo-American jurisprudence . . . . The many cases denying a plea of double jeopardy after the discharge of a prior jury all appear to find their basis in the broad rule of manifest necessity and public justice announced in United States v. Perez, 9 Wheat 579 . . . . It must be noted that the United States Supreme Court, in stating the broad and lasting rule in the Perez case, also admonished trial courts that 'the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes . . . .' "

In the instant case the ends of public justice would have required a mistrial if the situation which prevailed at the time the State's motion was made remained unchanged; but after the defense had made its proposals there no longer was a manifest necessity for a mistrial. If either proposal had been accepted the unjust inference would have been eliminated and the harm to the State's case undone.

The prosecutor wanted no part of either proposal. He wanted the signed statement in evidence or a mistrial, and would settle for nothing else. The signed statement differed little from the oral one—in both Westbrook said Chaffin shot him. If the signed statement would have removed the inference, the oral one would have done so. Similarly, the defense stipulation that Slajchert did not shoot Westbrook would have dispelled the inference that he had done so.

The prosecutor knew that the court would not admit the signed statement into evidence and his insistence upon its admission as the only possible cure for the objectionable inference makes it appear that what he really

wanted was a mistrial. This conclusion is further supported by the fact that he had made prior requests for a mistrial on the ground that the credibility of his witnesses had been destroyed by improper cross-examination. In obtaining the mistrial the State got what it wanted, a chance to retry the case before a new jury. A mistrial, however, cannot be granted to afford the State a second chance or to protect it from the unexpected weakness of its case or the skill of its adversary.

The State maintains that the mistrial was granted to protect the defendant not the State. The court had expressed concern about the rights of the defendant and would not admit the signed statement for this reason. (Although the court was agreeable to the admission of the oral statement which was equally harmful to the defendant, the explanation for this inconsistency lies in the court's having been informed of the content of the signed statement but not of the oral one.) But the mistrial was not declared to safeguard the defendant; it was declared upon the State's motion and at the State's insistence. In ordering the mistrial over the defendant's vehement objection the court acceded to the State's demand.

Finally, the State contends that the mistrial was justified by the defendant's improper cross-examination of the accomplices, Gardner and Slajchert. The cross-examination of these witnesses was rigorous but the accused in a criminal prosecution is permitted broad latitude in cross-examining State's witnesses (People v. Rainford, 58 Ill App2d 312, 208 NE2d 314 (1965)), and this is particularly so when the witnesses are accomplices. People v. Baker, 16 Ill2d 364, 158 NE2d 1 (1959); People v. Durand, 321 Ill 526, 152 NE 569 (1926). There were some improprieties in the cross-examination—the questioning of Gardner about beatings unrelated to the instant case and the questioning of both witnesses about wearing beards prior to the trial—but these excesses were not

sufficient to warrant a mistrial. Cf. People v. Thomas, 15 Ill2d 344, 155 NE2d 16 (1958).

The trial court abused its discretion in granting a mistrial and the decision of the motion judge, finding that the defendant's trial had been improperly terminated, is affirmed.

Affirmed.

SULLIVAN, P. J. and SCHWARTZ, J., concur.