THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HENRY JONES *et al.*, Defendants-Appellants.

First District (5th Division)   No. 78-1796

Opinion filed March 14, 1980.

James J. Doherty, Public Defender, of Chicago (Vincent D. Pinelli and Ira Churgin, Assistant Public Defenders, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and James L. Alexander, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Henry and Edward Jones were each indicted for four counts of armed robbery. (Ill. Rev. Stat. 1975, ch. 38, par. 18—2.) Two of the counts were stricken with leave to reinstate upon the State's motion. A jury found both defendants guilty on the remaining counts. Henry was sentenced to a term of 4 to 6 years while Edward received 5 to 12 years. On appeal, they contend that: (1) testimony concerning threats allegedly made by Edward was erroneously admitted at trial; (2) the prosecutor violated his promise to introduce only an excised statement at trial; (3) they were prejudiced by the complainants' testimony that they were afraid to testify; (4) Henry was denied effective assistance of counsel; (5) the trial judge should have ordered a severance *sua sponte*; and (6) they were not proved guilty beyond a reasonable doubt. We affirm. The pertinent facts follow.

On September 4, 1976, there was a dice game on a third floor landing in a public housing project. At about 7:15 p.m. three men robbed the participants at gunpoint. Defendants were arrested and indicted for four counts of armed robbery. On motion of the State, two counts were stricken with leave to reinstate.

In its answer to discovery the State indicated that it intended to introduce at trial statements made by Edward Jones, the contents of which were contained in a police report. Prior to trial, Edward's counsel stated that the police reports referred only to statements made by Edward to Percy Thomas and that he had just learned that the State intended to use statements made by Edward to another complaining witness, Acie Matthews. Counsel requested that the State inform him of the contents of such conversations.

The State responded that the statement made to Matthews was identical to the one made to Thomas and that an excised statement would be used at trial omitting any reference to Henry Jones contained in the original. As an offer of proof, the State stated that it expected that Matthews would testify that he, Edward Jones and Percy Thomas were in the latter's bedroom. After he spoke to Thomas, Edward told Matthews:

"Sit down. I want you to hear this too. If you cooperate, nothing is going to happen and I will try to get money back. If you don't cooperate, I will get you. If I can't get you, I will get your family. If I can't get your family, I will blow up your house. If something happens to me, my friends will take over."

Edward's counsel made a motion *in limine* to bar the introduction of the statement since it was evidence of another crime, intimidation. Henry's counsel joined in the motion. The State argued that the statement showed identity and guilty knowledge on Edward's part and the motion was denied.

On the first day of trial the two complaining witnesses, Acie Matthews and Dan Adams, failed to appear in court pursuant to their subpoenas. Warrants for their arrest were issued to insure their presence for the following day.

The State's evidence at trial showed the following. At about 6:30 p.m. on September 4, 1976, Acie Matthews joined a dice game which was already in progress on a third floor landing. Matthews testified that the landing was well lit. Dan Adams and another victim, Percy Thomas, testified that they arrived at about 7 p.m. and others joined in the game. Matthews said that two women were present, but Thomas testified that there was only one. Matthews also testified that he saw Bobby McCall for about 5 minutes while Adams testified that he did not see McCall that night. Bobby Chester also watched the game for a short time and then left.

Matthews testified that at one point during the game Alvin Jordan and Henry Jones came down the staircase. Matthews had seen both of the men previously. Dan Adams asked, "[W]hat is happening?" to which Jordan replied, "What is the beef, punk?" and the two continued downstairs. Percy Thomas corroborated Matthews' account of this incident, but Dan Adams stated that Edward Jones was also with Jordan and Henry Jones.

The game was about to end at about 7:15 p.m. when Bobby Chester returned and encouraged its continuance. Several minutes later Henry Jones and Alvin Jordan came down the stairs. Henry Jones announced a stickup and told Bobby Chester to leave. Henry had a snub-nose revolver and Jordan had a switchblade. Matthews and Adams dropped their money and Matthews began backing down the stairs when his head bumped into a gun. He turned and saw Edward Jones holding a .357 magnum pistol. Edward told him to turn around or he would blow his head off. Matthews looked at Edward for 10 seconds. From a distance of about 5 feet, Dan Adams saw Matthews bump into Edward's gun. Contrary to his earlier testimony, on cross-examination Adams testified

that this was the first time he saw Edward that evening. Percy Thomas also saw Edward for 4 or 5 seconds.

Edward stood at the top of the stairs while Henry blocked the door to the third floor and Jordan searched the victims' pockets. Jordan took various amounts of cash from the three men. Edward told Jordan to get it all and Jordan searched them again. Edward removed a watch from Matthews' arm, enabling him to see Edward's face a second time. After the robbery the victims were told to run up the stairs and not to look back.

None of the witnesses had ever seen Edward Jones before the robbery. Matthews testified that he viewed Edward for a total of about one minute. Adams viewed Edward for less than a minute while Thomas saw him for only a few seconds. All of the witnesses had seen Henry Jones on previous occasions.

Matthews called the police from his apartment, and Chicago police officers Kalemba and Senise responded to the call. Matthews told the police that he knew Jordan and gave them his address. He described the other two men as: (1) 5'7" tall, 135 pounds, approximately 21 years old, wearing a red tank top, jeans and a sun visor; and (2) 5'9" tall, 150 pounds, with his hair curled in the back, wearing a light-colored shirt and dark blue jeans. Adams and Thomas gave similar descriptions of the two other men. The three witnesses were taken to a police station where they identified Bobby Chester at a lineup.

Officers Kalemba and Senise drove the witnesses in an unmarked squad car for about 15 minutes before stopping at a street corner. Matthews and Adams testified that Thomas said he saw one of the robbers in a group of about 15 men. A lineup was conducted on the street and all three witnesses identified Henry Jones who was wearing a red tank top. At trial Matthews and Adams identified Henry Jones as one of the robbers and the man they picked out on the corner. Percy Thomas testified at trial that he was sure of his identification of Henry and Edward Jones, although he had earlier expressed concern that he may have misidentified Edward. He also stated that he saw both Henry and Edward on the street corner and saw Henry but not Edward arrested.

At about 11 a.m. the following day Edward Jones went to Percy Thomas' house. Thomas testified that he was in his bedroom when Edward came in and told him that he had the wrong man in jail. He warned Thomas about not cooperating with him when Matthews came into the room. Edward repeated the threat to Matthews who testified that Edward "told me if we cooperate and get us our money back. We don't cooperate he would get, if he don't get my family and if he don't get my family he will blow up my house. If he can't get me, his friends will." Edward opened his jacket and both Matthews and Thomas testified that

they saw the gun Edward had used in the hold-up in a shoulder holster. On cross-examination Thomas admitted that he testified at a pretrial hearing that he had not seen a gun on Edward. After Jones left Matthews phoned the police and told them about the threat.

Officer Kalemba secured a photograph of Edward Jones. He showed Matthews five to 10 pictures including Edward's. Matthews identified Edward as one of the robbers. At trial Matthews identified Edward as the man whose photograph he had selected. Officer Kalemba turned Edward's photograph over to Chicago Housing Authority guards and Edward was arrested a short time later. Edward was taken to a police station and placed in a lineup. Dan Adams and Percy Thomas identified Edward as one of the robbers. Thomas later told police that he thought he had made a mistake.

At trial, Matthews, Adams and Thomas each identified Edward and Henry Jones as two of the robbers. On cross-examination Matthews admitted that he had told the State that he did not wish to testify and that he had lied to an assistant state's attorney before when he told him that he was unsure of his identification. Dan Adams also admitted during cross-examination that he lied before trial when he expressed doubt about his prior identification of Edward Jones.

Matthews and Adams testified that Dennis Reed, defendant Henry's friend, had spoken with them and Percy Thomas. Matthews testified that Reed told them that they had the wrong man and urged them to drop charges. Matthews testified that he had earlier expressed uncertainty about his identification because he was told to do so. In addition, he stated that while traveling to court on a public conveyance Henry Jones tried to convince him to drop charges. Over defense objection Matthews was allowed to testify that earlier that day Henry Jones had made threatening gestures to him outside the courtroom. Finally, in response to a question by the State, Matthews stated that although he was scared, he was telling the truth at trial.

Adams testified that Reed had urged him to drop charges. Adams said that earlier he had told an assistant state's attorney that he was unsure of his identification of Edward but that he was now sure that it was correct.

Two witnesses testified in defense. Bobby McCall testified that he was with Percy Thomas at about 5 or 5:30 p.m. on September 4, 1976. They injected themselves with heroin on the 14th floor of the housing project and at about 7 p.m. entered a dice game on the third-floor landing of that building. He and Thomas smoked marijuana during the game but he did not see Dan Adams smoke any. Alvin Jordan approached with a gun and announced a stickup. McCall saw another person with a gun and

two or three others but he had never seen them before and did not know them. He also testified that Edward Jones accompanied the gunmen but did not have a gun and that Henry Jones was not one of the people with a gun nor did he accompany anyone with a gun. McCall never saw Bobby Chester at the game. After the robbery, some people ran upstairs and some downstairs.

McCall did not report the incident because he did not want to get involved. About a week and a half after the robbery he saw Percy Thomas. At that time Thomas told him that he had identified someone but that he was not sure.

McCall admitted that he had been a heroin user for about 1½ years before the robbery and that he had pleaded guilty to burglary and a probation violation for which he received concurrent sentences of one to four years. Bobby Chester's brother was also a mutual friend of his and Edward Jones.

Henry's wife, Georgette, testified that on September 4, 1976, she saw her husband when she left for work at 9 a.m. and at 3 p.m. when she returned home. He left their home at 5:30 p.m. and returned at 6:40 p.m. where he remained until 9:30 p.m. On cross-examination she stated that when he came home at 6:40 p.m. he wore a rust-color sleeveless shirt and green pants. A friend of theirs was visiting and he and Henry watched television until 9:30 p.m. She next saw her husband after he was in custody. She attempted to locate the visiting friend for trial but was unable to do so.

The jury found each defendant guilty of two counts of armed robbery and this appeal followed.

OPINION

I.

Defendants contend that the trial court erred in allowing testimony regarding Edward's threats to Thomas and Matthews. They argue that it constituted evidence of another crime, intimidation, and that it did not show a guilty knowledge of the robbery on Edward's part since he had not been charged with the robbery at the time he made the statement. They argue that the statement merely showed Edward's concern for his brother and should not have been admitted at trial since it suggested that Edward committed the armed robbery. In addition, they argue that the statement which was to be introduced was to omit any reference to Henry. However, in response to the state's attorney's questioning, Percy Thomas testified that "[Edward] said, told me I had the wrong man in jail." Henry contends that the reference to "the wrong man in jail" suggested that he was responsible for the threats and that Matthews' testimony that Henry threatened him at trial strengthened this inference.

Because Edward's statement could have been imputed to Henry to his detriment, he argues that its admission was improper.

■■ Any attempted intimidation of a witness in a criminal case is properly attributable to a consciousness of guilt and is thus relevant. (*People v. Gambony* (1948), 402 Ill. 74, 83 N.E.2d 321, *cert. denied sub nom. Gambony v. Ragen* (1949), 337 U.S. 910, 93 L. Ed. 1722, 69 S. Ct. 1045; *People v. Goodman* (1977), 55 Ill. App. 3d 294, 371 N.E.2d 168.) Edward recognizes this general rule but contends that the person must be suppressing information *against himself* and that since he had not been charged when the statement was made he was merely pleading for his brother making the exception inapplicable to him. The happenstance that Edward was not arrested immediately after the robbery does not lead to the conclusion that he was not acting in his own behalf when he threatened Thomas and Matthews. Looking at the circumstances as they existed at the time of the threats, it is arguable whether Edward was suppressing evidence against himself or pleading for his brother. At the time of trial, however, it was clear that he was acting, at least partially, in his own behalf. Had Edward been the sole robber in this case, there could be no doubt that he was attempting to suppress evidence against himself even though he had not been charged with the crime at the time of the threats and the evidence would be admissible. (See *People v. Spaulding* (1923), 309 Ill. 292, 141 N.E. 196.) An added codefendant would merely make it arguable that he acted solely in the other's behalf without any guilty knowledge on his own part. The evidence was still relevant and properly admitted against Edward, and the weight to be given to it would be for the jury to determine.

■■ Henry's contention that the statement prejudiced him because the jury could have inferred that he was responsible for Edward's threats is speculative. In any event, defendant made no objection to the testimony at trial and did not raise the issue in his motion for a new trial, thus waiving the issue for review. (*People v. McCorry* (1972), 51 Ill. 2d 343, 282 N.E.2d 425; *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Even if the issue were preserved for appeal, the statement was ambiguous and would not clearly suggest Henry's participation. Assuming that the jury inferred that Henry was responsible for the threats, in view of the other threats made by him at trial, the admission of the statement could not have unduly prejudiced him.

■ Finally, after Acie Matthews testified about the statement, in response to an objection by Henry's counsel, the trial court ruled, "The statement will be received only on behalf of one Defendant." A limiting instruction was given to the jury, telling them not to consider evidence limited to one defendant against any other defendant. From the context of the court's ruling, it would be clear to the jury that consideration of the

statement should be limited to Edward. The limiting instruction was adequate to protect Henry's interests. See *People v. Davis* (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.

## II.

Defendants next contend that the assistant state's attorney violated his promise to introduce only an excised statement omitting any reference to Henry when he elicited the statement "He said, told me I had the wrong man in jail" from Percy Thomas. They argue that he aggravated the prejudicial effect in his closing argument when he said, "when he comes the next day and he says if you cooperate with me I'm going to get your money back. *Well is he in there to cop a plea for his brother,* that's baloney. He knows that he is in trouble he is there to save himself." They maintain that, in so doing, the assistant state's attorney violated his duty to insure defendants a fair trial. The State contends that by failing to object to either statement or to include them in their motion for a new trial, defendants have waived this issue for appeal. (*People v. McCorry* (1972), 51 Ill. 2d 343, 282 N.E.2d 425; *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) We feel that this failure should not bar defendants from a consideration of this issue.

■ The record is clear that the State represented to the court that "the statement doesn't make any reference to Henry Jones." The court relied on this representation when it later stated, "There is nothing in that statement that in any way connects the other Jones [Henry]." The questioning of Percy Thomas does not appear to be a deliberate attempt to elicit any reference to Henry and Thomas' response would be inadvertent. It did not clearly identify Henry since it could have referred to Alvin Jordan. However, any doubt about who the "wrong man in jail" referred to was resolved by the assistant state's attorney's closing argument. The jury was thereby made aware of precisely what the parties had agreed to delete. We do not condone such a flagrant disregard of a pretrial agreement made in the presence of the court. Although improper, the violation of the pretrial agreement by the assistant state's attorney does not require reversal of defendants' convictions. Even if the jury could infer that Henry was responsible for Edward's threats, in view of the testimony of the victims and the evidence of Henry's own threats made at trial, defendants were not denied a fair trial nor could the jury's verdict have been affected by the violation of the pretrial agreement. Since it does not appear that justice was denied or that the jury verdict may have resulted from the error, defendants' convictions need not be reversed. *People v. Tranowski* (1960), 20 Ill. 2d 11, 169 N.E.2d 347, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290, and (1962), 368

U.S. 978, 7 L. Ed. 2d 440, 82 S. Ct. 484; *People v. Price* (1979), 76 Ill. App. 3d 613, 394 N.E.2d 1256.

## III.

Defendants also claim they were prejudiced when Acie Matthews and Dan Adams were asked whether they were afraid to testify. They argue that the questioning suggested unrelated misconduct on defendants' parts and left the jury with the impression that the witnesses were being continuously threatened by defendants. Specifically, they complain of the following questioning of Acie Matthews on redirect:

"Q. [Assistant State's Attorney]: A. C. [*sic*], you testified that you were frightened when that gun was put out, is that right?

A. Yes.

Q. Are you frightened as you sit in that chair right now and testify to this Court and jury?

A. Yes.

[Counsel for Henry Jones]: Objection, your Honor.

THE COURT: Objection overruled.

* * *

Q. The day before yesterday, A. C. [*sic*], did I call you on the telephone?

A. Yes.

Q. Did I tell you to come down to Court?

A. Yes.

Q. Did I tell you to be ready about 9:15?

A. Yes.

Q. Where did you go?

A. I went to school.

Q. All right. The day after that did I call you up and tell you you were under subpoena and come down to court?

A. Yes.

Q. And did I tell you to come down at 9:15?

A. You told me your investigator would pick us up at 9:15.

Q. Did you appear for the investigator to pick you up and to bring you here?

A. No.

Q. Why didn't you come?

A. I went to school.

Q. Were you scared?

[Counsel for Edward Jones]: Objection.

THE WITNESS: Yes, I was.

THE COURT: Overruled."

Further, during the redirect examination of Dan Adams, the following exchange took place:

"Q. Dan, when I talked to you last Tuesday I told you to come in, is that right?
A. Correct.
Q. And you didn't come in, is that correct?
A. Yes.
Q. Were you scared?
A. No.
Q. Are you scared now as you sit in that witness stand?
[Counsel for Henry Jones]: Objection, Judge.
THE COURT: Objection overruled."

Contrary to defendants' assertion, the testimony was relevant and properly admitted at trial. As discussed earlier, any attempted intimidation of a witness in a criminal case is properly attributable to a consciousness of guilt and is thus relevant. (*People v. Gambony* (1948), 402 Ill. 74, 83 N.E.2d 321, *cert. denied sub nom. Gambony v. Ragen* (1949), 337 U.S. 910, 93 L. Ed. 1722, 69 S. Ct. 1045; *People v. Goodman* (1977), 55 Ill. App. 3d 294, 371 N.E.2d 168.) The evidence of intimidation by Henry and Edward Jones presented at trial included the following: (1) Edward's threats to Thomas and Matthews at Thomas' apartment; (2) Dennis Reed urged the witnesses not to testify; (3) Henry threatened Matthews during a court recess; and (4) Henry tried to get Matthews to drop charges while *en route* to court. This evidence was relevant to establish defendants' guilt.

■ The cumulative impact of these threats on the witnesses would also be relevant to explain any uncertainty or inconsistency between their pretrial and trial testimony or reluctance to testify at trial. Although under subpoenas, Matthews and Adams failed to appear for the first day of trial, and arrest warrants were issued to insure their appearances. The jury later became aware of this fact and could infer that they were unwilling witnesses. To rebut this inference the State could show the reason for their nonappearance, namely, fear of reprisal from defendants. In addition, each of the witnesses testified that, at one time or another, they felt that they may have misidentified defendants. Identification was critical in this case, and evidence of earlier uncertainty would lessen the weight accorded the in-court identifications. The fact that the witnesses had been threatened and were afraid would therefore be relevant to explain their earlier doubt. Indeed, Matthews testified at trial that he changed his story and expressed doubt about his identification because "[t]his is what I was told to tell them."

The questioning of the witnesses was therefore proper and left the

jury with the correct impression, which was supported by the evidence, that the witnesses were being continuously threatened by defendants.

## IV.

Henry Jones contends that he was denied effective assistance of counsel because his attorney failed to move for a severance although it was apparent that the codefendants' positions would be antagonistic. He asserts that this mistake was compounded by the attorney's failure to request an instruction limiting the jury's consideration of Edward's threatening statement to proof of Edward's guilt. In addition, the antagonism was demonstrated when evidence of Henry's threats to Acie Matthews during trial was brought out by Edward's counsel. Finally, he argues that the ineffectiveness of his attorney was demonstrated when he informed the jury that Alvin Jordan, who had also been charged with the robberies, had confessed and was in jail, thereby suggesting that Henry was also guilty.

Defendants bear the burden of clearly establishing incompetence of counsel in carrying out his duties at trial and that substantial prejudice resulted therefrom, without which the outcome would probably have been different. (*People v. Stepheny* (1970), 46 Ill. 2d 153, 263 N.E.2d 83; *People v. Morris* (1954), 3 Ill. 2d 437, 121 N.E.2d 810.) This burden has been held to require that defendant show incompetent behavior by his counsel which had the effect of reducing his trial to a farce or sham. (*People v. Shestiuk* (1978), 59 Ill. App. 3d 296, 376 N.E.2d 56; *People v. Virgil* (1977), 54 Ill. App. 3d 682, 370 N.E.2d 74.) The fact that another attorney might have conducted the trial in a different manner should not be accepted as an indication of incompetency. *People v. Virgil.*

Viewing the record as a whole, Henry's trial was not reduced to a farce or a sham by his attorney's representation. Henry asserts that once his attorney became aware of the possibility that Edward's intimidating remarks may be imputed to Henry, there was no tactical reason for not moving for a severance. However, Henry's attorney was clearly aware of the problem and decided to protect his client by having the statement excised to omit any reference to Henry, avoiding the need for a severance. His decision not to seek a severance was a tactical decision. Errors in judgment or trial strategy do not establish incompetency of counsel. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Knowles* (1979), 76 Ill. App. 3d 1004, 395 N.E.2d 706.) Prior to trial, it appeared that adequate protection of Henry's interests would be provided by the use of the excised statement and the decision not to move for a severance was not without a tactical basis.

Henry asserts that the failure of his attorney to request a limiting

instruction regarding Edward's threats compounded the failure to move for a severance. The record reveals that such an instruction was submitted by the prosecution and given by the court, obviating the need for defense counsel to submit one. We therefore find no incompetence of counsel demonstrated by the omission.

Henry claims that the failure to move for a severance caused further harm to him when Edward's counsel in his cross-examination of Matthews elicited the fact that Henry had threatened the witness at trial. When the decision not to move for a severance was made, Henry's counsel could not be expected to anticipate that his client would threaten a witness several days later and that a codefendant's attorney would bring that fact out. When the evidence was brought out at trial, Henry's counsel objected immediately and then sought to eliminate any prejudice to Henry on his own recross-examination of Matthews. Far from demonstrating any incompetence on Henry's counsel's part, the record reveals a diligent effort to protect his client's interests and present an effective defense.

Finally, Henry claims that his counsel's incompetence was shown by the fact that on cross-examination of Matthews he informed the jury that Alvin Jordan, who Matthews had stated was also involved in the robbery, had confessed and was in jail. Henry suggests that the implication would be that if Jordan had confessed then he must also be guilty. A review of Matthews' cross-examination by Henry's attorney reveals an attempt to establish that other men were responsible for the robbery and not Henry. Counsel asked Matthews about Bobby Chester and a man named David and their participation in the crime. Mentioning the fact that Jordan was guilty might have demonstrated that these other men and not Henry were responsible. In any event an objection to the attorney's statement was sustained and Matthews' response, "I don't know nothing" would not inform the jury whether Jordan was in fact guilty. It appears that the statement was a part of counsel's trial strategy and does not show incompetence.

The record reveals that Henry's counsel actively and diligently represented him. Henry has failed to establish any instances of actual incompetence on the part of his attorney at trial. In addition, he suffered no prejudice without which, considering the identification testimony and other evidence at trial, the outcome would probably have been different. We therefore find this issue to be without merit.

## V.

Defendants contend that the trial court's failure to order a severance *sua sponte* denied them a fair trial. They contend that the following instances clearly showed that their positions would be antagonistic:

(1) Edward's threats to Matthews and Thomas implicated Henry; (2) on cross-examination of Matthews, Edward's counsel elicited evidence of threats made by Henry; (3) on cross-examination of Matthews, Henry's counsel established that Dennis Reed had spoken to the witness and on redirect the State showed that "[Reed] told us we had the wrong man in jail and he didn't want to see his boy go down to the pen."

Neither defendant moved for a severance prior to trial and they would generally be foreclosed from claiming prejudice. (*People v. Appold* (1976), 39 Ill. App. 3d 814, 350 N.E.2d 511.) A court has no obligation to order a severance *sua sponte*. (*People v. Carver* (1966), 77 Ill. App. 2d 247, 222 N.E.2d 17.) Defendants rely on *People v. Wheeler* (1970), 121 Ill. App. 2d 337, 257 N.E.2d 587, as authority for their position. In that case it was learned before trial that a codefendant had made a statement which clearly implicated defendant and would greatly prejudice him at trial. The trial court denied a motion to suppress the statement and defendant's attorney did not seek a severance. The appellate court reversed defendant's conviction and remanded the cause for a new trial, reasoning that it was the duty of the trial court to order a severance *sua sponte* since defendant was greatly prejudiced by the admission of the statement and there could be no benefit to defendant from the decision not to sever the causes. It appears from the dissenting opinion in *Wheeler* that without the statement itself the State had not proved defendant's guilt, and the conviction could be reversed outright.

In determining whether a severance should be granted, the primary question is whether the defendants' defenses are so antagonistic that a fair trial can be assured only by a severance. (*People v. Canaday* (1971), 49 Ill. 2d 416, 275 N.E.2d 356; *People v. Davis* (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.) In the instant case the only indication that the defenses may have been antagonistic was Edward's statement to Matthews which may have implicated Henry. A statement of one defendant implicating the other is grounds for a severance unless the State promises either to avoid the introduction of the statement into evidence or to delete any references to the other defendant. (*People v. Strayhorn* (1965), 35 Ill. 2d 41, 219 N.E.2d 517; *People v. Allen* (1976), 36 Ill. App. 3d 821, 344 N.E.2d 825.) Here, the State agreed to excise the possible reference to Henry and avoid the need for separate trials. There was no reason for the trial court to order a severance *sua sponte* at that time. At trial, when the reference to Henry was brought out, a *sua sponte* severance and declaration of a mistrial would have created double jeopardy problems. See *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227.

■■ Unlike *Wheeler*, here defense counsel was successful in having the objectionable reference omitted before trial and could have concluded that a joint trial would be to his client's benefit. In addition, the vague

reference to Henry was not the crucial link in the State's case which included three eyewitnesses who identified defendants at trial. Any prejudice to defendants caused by a joint trial was not apparent or conclusive as that in *Wheeler*. We therefore find that the trial court had no duty to sever defendants' trials *sua sponte*.

## VI.

Defendants' final contention is that they were not proved guilty beyond a reasonable doubt. They argue that although four of the six victims were originally named as complainants, at the time of trial only two complainants, Acie Matthews and Dan Adams, testified. These two as well as Thomas were reluctant to testify and had expressed uncertainty about their identifications before trial. On the day of trial, Adams and Matthews ignored their subpoenas and arrest warrants had to be issued to secure their presence. In view of their reluctance to testify, defendants argue the witnesses' credibility was placed in question.

Additionally, defendants point to a number of discrepancies and contradictions in the witnesses' testimony which they claim raise a reasonable doubt of their guilt. Among these are: (1) Matthews stated that two girls were at the game while Thomas said there was only one; (2) Matthews said Bobby McCall was at the game while Adams did not see him; (3) Matthews and Adams stated that Thomas was the first to identify Henry on the street corner while Thomas said that he did not see Henry on the corner and that Matthews was the first to identify Henry; (4) Adams testified that he saw Edward, Henry and Alvin Jordan when they first came down the stairs but later said he first saw Edward during the robbery; (5) Adams testified he told only an assistant state's attorney that he was unsure of his identifications but later admitted that he told Dennis Reed that he had made a mistake; and (6) other inconsistencies in the witnesses' testimony. Edward also challenges his identifications and Henry contends that his uncontradicted alibi raises a reasonable doubt of his guilt. We do not agree.

■ The discrepancies noted by defendants are minor and concern the circumstances surrounding the crime. They affect the weight to be given the testimony and the credibility of the witnesses. A reviewing court may not substitute its judgment on questions involving the weight of the evidence or the credibility of the witnesses, and will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) When considered as a whole, the evidence is not so improbable as to raise a reasonable doubt of the defendants' guilt. *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.

■■ Edward challenges his identification contending that none of the witnesses had seen him before and they had an inadequate opportunity to observe him. He argues that this conclusion is borne out by the fact that before trial all three witnesses expressed doubt as to whether Edward participated in the robbery. The testimony of a single eyewitness is sufficient to convict where the witness is credible and he viewed the accused under circumstances as would permit a positive identification to be made. (*People v. Manion.*) In the instant case the witnesses had adequate opportunities to observe Edward on a well-lighted landing. Matthews saw Edward for about a minute, Adams saw him for less than a minute, while Thomas saw him for a few seconds. After the confrontation in Thomas' bedroom, Matthews picked Edward's picture from a group of photographs and Adams and Thomas picked him from a lineup. The identifications made at trial were positive and the witnesses stated that they were testifying truthfully at trial. Their reluctance to testify and earlier uncertainty of the identifications do not negate the positive trial identification when the evidence of intimidation is considered. The threats were a circumstance to be considered with their hesitancy and earlier uncertainty in assessing the accuracy of their identifications at trial and the issue was resolved against Edward.

■■ Finally, the jury was under no obligation to believe Henry's alibi evidence (*People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1; *People v. Tennant* (1976), 65 Ill. 2d 401, 358 N.E.2d 1116, *cert. denied* (1977), 431 U.S. 918, 53 L. Ed. 2d 229, 97 S. Ct. 2184), and it was the jury's function to judge the credibility of the alibi witness and give weight to her testimony. (*Brown.*) The jury obviously did not value the alibi testimony here and we will not overturn the jury's verdict simply because conflicting evidence was presented. *People v. Brown.*

For the foregoing reasons the judgments of the circuit court are affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.