THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LaVERN LUMPKIN *et al.*, Defendants-Appellants.

Fifth District    No. 80-439

Opinion filed April 1, 1982.

Randy E. Blue and John W. McGuire, both of State Appellate Defender's Office, of Mt. Vernon, for appellants.

John Baricevic, State's Attorney, of Belleville (Martin N. Ashley and David J. Mullett, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE JONES delivered the opinion of the court:

Defendants LaVerne and Lester Lumpkin were convicted of the offense of murder following a joint trial before a jury in the circuit court of St. Clair County. On appeal defendants contend that the trial court erred in denying their motions for mistrial after the prosecutor introduced, in the form of a leading question, prejudicial evidence which the prosecution had represented would not be used at trial. In addition, defendant Lester Lumpkin asserts that he was denied a fair trial due to the trial court's failure to sever his trial from that of his codefendant, LaVerne Lumpkin, when LaVerne's out-of-court statement was used at trial. Lester argues in the alternative that he was denied effective assistance of counsel by his attorney's failure to raise the issue of severance properly.

The decedent, Ricky Hilliard, was found on March 8, 1980, in a deserted area off Interstate 70 with a shotgun wound to his chest as well as two additional bullet wounds to his back and his left thigh. The defendants were arrested shortly afterwards in the nearby town of Venice, Illinois, and charged with the shooting. At the time they were apprehended, defendant Lester Lumpkin was carrying a .38 revolver, and defendant LaVerne Lumpkin was in possession of a .20-gauge shotgun.

Prior to their joint trial, the court denied LaVerne's motion to suppress a statement made by him after his arrest. Lester's attorney then advised the court that LaVerne's statement implicated Lester and that he would be unable to cross-examine LaVerne regarding this statement if the defendants were tried together. Lester's attorney stated that he had a

motion for severance prepared although he felt it would be premature at that time. The court responded:

"We will wait until that arises. If it arises, and you feel it is important to the defense of your case, the severance, then we would have to sever it at that time."

Lester's attorney subsequently made no motion for severance at trial and did not object when LaVerne's statement was admitted at trial.

In his opening statement, the prosecutor advised the jury that the evidence against the defendants was circumstantial and that there was no known motive for the alleged offense. Counsel for LaVerne Lumpkin asserted that the defendants were coming to the aid of the decedent on the day of the alleged murder and that, when they were arrested, they were within a few blocks of the police station on their way to turn in the weapons they had found.

The State's first witness, Dawn Thurman, testified that she had lived with the decedent for several months before his death. On March 8, 1980, the decedent had come home at 8 a.m. after being gone the night before, picked up his shotgun and told her he was going hunting. Ms. Thurman observed two men, whom she identified as the defendants, sitting in the decedent's car, which was parked in front of the house. She stated that she had known the Lumpkin brothers for some time and that the decedent had been a close friend of the defendants, having lived at their home during one period when he was out of a job.

Clarence Hart testified that on March 8, 1980, at approximately 8 a.m., the decedent had driven up to his farm near the intersection of Interstate 70 and Route 203. The decedent had parked his car, approached Hart, and asked for permission for himself and his two companions to hunt on Hart's land. Hart observed two black men in the back seat of the car, which was parked about 50 feet away, but he was unable to observe anything more about them.

Ronald Watson testified that on March 8 he was fishing in a pond near the intersection of Interstate 70 and Route 203. Between 7:30 and 8 a.m. the decedent's blue Buick Electra approached and stopped approximately 100 yards away from him, at which time three black men whom Watson could not describe got out of the car. After the three men left the car, Watson heard shooting which he recognized as shotgun and handgun fire, and he yelled to the men not to shoot in his direction. The men then walked out of sight. About 15 minutes later Watson heard a burst of closely spaced handgun fire, followed by shotgun fire, followed by more handgun fire. A minute or so later Watson observed two black men reappear and walk out of sight on the frontage road that ran west to Route 203 and parallel to Interstate 70. The two men did not appear to be carrying anything. Watson assumed that these were two of the three men

he had seen before because he had not seen anyone else in the area; however, he did not actually see any shots fired and did not know for certain that it was this group of three men that had been shooting.

Venice police officer Joseph Mehan testified that the defendants were seen at about 10:30 a.m. on March 8 walking together on Washington Street in Venice, Illinois. As the police car approached them, LaVerne Lumpkin dropped the .20-gauge shotgun which he had been carrying and continued walking until Mehan ordered him to stop. When the defendants were arrested, Lester Lumpkin was carrying a .38 revolver in his pocket. The Venice police department was three blocks from where the defendants were arrested, although the defendants would have had to make one right turn to arrive there. One block in the direction from which the defendants were walking was a field, beyond which were some railroad tracks that ran from the vicinity of the alleged murder to Venice.

Firearms expert Larry Lorsbach testified that tests performed on a spent .20-gauge shotgun shell found at the scene of the alleged offense established that the shell had been fired in the shotgun LaVerne was carrying at the time of arrest. Plastic wadding and shot recovered from the decedent's chest were of the same type as those normally contained in this brand of shell. Examination of the .38 special bullet recovered from the decedent's thigh established that it was fired from the revolver which Lester had in his possession at the time of the arrest. This revolver contained six spent shells, consisting of two of the .38 special variety and four of the shorter .38 S & W variety. The bullet recovered from the decedent's upper body was of the .38 S & W variety. This bullet had characteristics similar to those of a sample bullet fired from Lester's revolver, but Lorsbach could not determine whether the bullet had been fired from that revolver.

Forensic pathologist Dennis Aubuchon testified that a red substance on the shirt LaVerne was wearing when arrested was type "B" human blood, the same type as that of the decedent. A pair of gloves belonging to LaVerne had human blood on them of an undeterminable type. No blood was found on the clothing of Lester Lumpkin. Both LaVerne and Lester had type "O" blood.

Louis Reddo of the Illinois Department of Law Enforcement testified that the decedent's car was found one-quarter mile east of Route 203, on the frontage road south of the parallel to Interstate 70. The car was pointed east and the front passenger door was open. The decedent's dark half-length jacket was found one foot west of the rear of the car. Blood samples found in the vicinity of the car and near the fence along Interstate 70 were determined to be type "B," that of the decedent. The keys of the car were found 12 feet west and to the rear of the vehicle.

Glen Allen testified that he knew the Lumpkin brothers and had

known the decedent. He had last seen the decedent on March 7, 1980, the night before the alleged offense, at M C's Lounge in East St. Louis, at which time the decedent was in the company of the defendants. Allen stated that he had observed the decedent and the defendants standing near the cigarette machine talking. At that point, assistant State's Attorney William Hanks asked the following question:

"[Mr. Hanks]: Now, did you overhear LaVerne that night trying or talking—did you overhear LaVerne talking about selling a gun that night?"

Counsel for LaVerne objected to this question, and in a discussion held in chambers both defendants moved for a mistrial. LaVerne's counsel stated that the defense had learned in discovery that Allen had been told by someone else that the Lumpkin brothers had possessed a gun. Counsel argued that because Allen had not actually seen the gun himself and had no personal knowledge of this purported possession, the prosecution had introduced prejudicial hearsay before the jury. Furthermore, the defense had been assured by assistant State's Attorney Judy Cates, who appeared at trial along with prosecutor Hanks, that the State would not question Allen regarding this alleged possession by the defendants of a gun. Counsel had relied upon this assurance and consequently had not filed a motion *in limine*. Ms. Cates affirmed that she had told the defense that Allen would not be questioned on this matter. Prosecutor Hanks stated, however, that he had not been advised of co-prosecutor Cates' statement to the defense and that, as he recalled, Allen's statement was that he had seen the gun himself. The court sustained the defense objection and admonished the jury to disregard the prosecutor's last question but denied defendants' motion for mistrial.

The State's next witness, Illinois Division of Criminal Investigation agent Jim Bivens, testified that he had questioned LaVerne on March 8, 1980, immediately after LaVerne was taken into custody. The following colloquy took place between Bivens and the prosecutor regarding La-Verne's statements:

"[BIVENS]: He then stated that he knew Mr. Hilliard, had known him for several years, and at times Mr. Hilliard stayed at his house, but he hadn't seen him in the last two or three days. He stated that he and his brother had been hunting that day in an area that I took, I understood him to say around the tanks, and he stated that they had fired the shotgun a couple of times at things.

[PROSECUTOR]: And did he say anything else about the shotgun?

[BIVENS]: Oh, he stated—I asked him if he knew anything about the shotgun, and it was a .20 gauge shotgun that was in his possession at the time he was apprehended or taken into custody,

and he stated that he didn't own a .20 gauge shotgun. He owned a .16 gauge shotgun, and he had obtained, I think it was several years ago, from his sister in Oklahoma."

At the close of the State's case, the court denied a motion by defendants for a directed verdict, and defendant LaVerne Lumpkin rested without putting on any evidence.

In his opening statement, which he had reserved, counsel for Lester Lumpkin reminded the jury that the two men Ronald Watson had seen leaving the area of the alleged murder had walked down the road in a westerly direction to the location of the car and that the men did not appear to be carrying anything. Counsel stated that the defendants' witness would establish that the defendants had left this area in a different direction.

Birdell Mouser testified for the defense that he was familiar with the pond south of Interstate 70 one-quarter mile east of Route 203 and that the pond was visible from the Interstate. Mouser was driving west on Interstate 70 one-quarter mile east of Route 203 at approximately 9:30 a.m. on March 8, 1980, when he observed two men running across the road from left to right in front of him. The two men crossed the Interstate at a point even with the lake. He could not determine their race but observed that one of the men carried a long object which could have been a shotgun. The two men ran across the highway in front of him, slowed the pace of their running and disappeared into the brush along the north side of the Interstate when Mouser's car was even with them.

During his closing argument the prosecutor made the following remarks concerning the defendants' theory of the case:

"And then we have been given to believe that they have come to seek aid. They have come to seek aid. They came all the way across country on a mission of mercy, and they finally get to the destination, there it is. What do they do? I ask you just to consider this. Does it make any sense at all? What about LaVerne's statement. LaVerne's statement, what does he tell them? I haven't seen Ricky Hilliard for two or three days. Glen Allen said they were together the night before. * * * So we know that LaVerne is not only a murderer, he is a liar as well."

Defense counsel asserted in closing argument that the defendants were not the two men Ronald Watson observed arrive with the decedent and leave the scene minutes later by way of the frontage road which runs west to Route 203. Rather, counsel argued, the defendants were the two men seen by Mouser leaving the area in a northerly direction at approximately 9:30 a.m., and the long object that one of them was carrying was the shotgun they had found at the murder scene.

The jury found both defendants guilty of the offense of murder.

Defendants filed post-trial motions alleging that the court had erred in denying their motions for mistrial. Lester Lumpkin also alleged in his post-trial motion that the court had erred in not severing his trial from that of codefendant LaVerne. The court denied the post-trial motions. LaVerne Lumpkin was sentenced to a term of 30 years imprisonment and Lester Lumpkin was sentenced to a term of 20 years.

In this appeal defendants initially contend that the court erred in denying their motions for mistrial after prosecutor Hanks improperly suggested to the jury that they possessed a gun on the evening prior to the incident. Defendants assert that this suggestion contradicted a crucial element of their defense—that they acquired the murder weapons only *after* someone else killed the decedent and left the weapons at the scene—and that this improper reference was sufficiently prejudicial to warrant a mistrial.

The evidence here claimed to be prejudicial consisted of prosecutor Hanks' question to witness Allen concerning LaVerne's attempt to sell a gun the night before the offense. The established rule for evaluating the effect of such evidence was articulated in *People v. Kavinsky* (1980), 91 Ill. App. 3d 784, 797, 414 N.E.2d 1206, 1217:

> "When the evidence validly placed in the record proves the guilt of the defendant beyond a reasonable doubt, introduction of improper 'evidence' through asked but unanswered inquiries is not a ground for reversal unless the conduct of the prosecution is so prejudicial as to produce a result not otherwise possible. [Citations.]"

In this case, there is sufficient evidence properly in the record to support the jury's finding of guilt beyond a reasonable doubt. In view of the testimony detailing the events surrounding the incident, the physical evidence, and the circumstances of the defendants' arrests, we do not believe the prosecutor's conduct of which defendants complain was so prejudicial "as to produce a result not otherwise possible."

The question posed of witness Allen in the presence of the jury was whether Allen had overheard LaVerne talking about selling a gun at M C's Lounge the night before the offense. There was nothing in the question to indicate that LaVerne at that time possessed one of the guns used to kill Ricky Hilliard the next day, and the suggestion that LaVerne tried to sell an undescribed gun *before* the offense is not inconsistent with the defendants' theory of the incident. Thus, it cannot be said to be so prejudicial that it caused the jury to render a result they would otherwise not have reached.

■■ Furthermore, the court in the instant case sustained a defense objection to the prosecutor's question and admonished the jury not to consider it in any way. As stated in *Kavinsky*, such action by the trial court

"generally relieves substantial prejudice, preserves fairness, and cures any error." (91 Ill. App. 3d 784, 797, 414 N.E.2d 1206, 1217.) Where, as here, no answer was made to the offending question, and where the question itself was not sufficiently prejudicial in light of the other evidence to warrant a mistrial, the trial court properly denied the defendants' motions for mistrial.

■■ Defendants point out that prosecutor Hanks' question concerning LaVerne's attempt to sell a gun violated a promise made by his co-prosecutor that the State would not use this evidence at trial. They contend that this breach of promise constituted prejudicial error under the rule of *People v. Mwathery* (1968), 103 Ill. App. 2d 114, 243 N.E.2d 429. In *Mwathery* the court reversed the defendants' convictions after the prosecution questioned a witness concerning a particular statement that it had promised not to use at trial. The court's reversal, however, did not follow from the State's violation of its promise, but was rather based upon the prejudicial effect of the improperly elicited evidence. (See *People v. Hall* (1971), 1 Ill. App. 3d 949, 275 N.E.2d 196.) The prosecutor's improper reference in *Mwathery* was highly prejudicial in that it indicated that an accomplice witness had confessed after reading a statement signed by one of the defendants. As discussed above, the question here posed to witness Allen was not of such a prejudicial nature. Moreover, the prosecutor in *Mwathery* emphasized the improperly elicited evidence during closing argument whereas, here, no further mention was made during the course of the trial of LaVerne's attempt to sell a gun. Even under the more compelling facts of *Mwathery* the court there indicated that the prosecutor's error alone might not have constituted reversible error. Under the circumstances of this case, we do not believe the isolated and unanswered question posed to Glen Allen warrants a new trial for the defendants.

■■ The second issue in this appeal concerns defendant Lester Lumpkin's contention that he was denied a fair trial due to the trial court's failure to order a severance when LaVerne's out-of-court statement was introduced at trial. We note, initially, that although Lester's counsel advised the court before trial that it might become necessary as the trial progressed to ask for a severance, no such motion was made at that time or at any time during the trial. The issue was first presented to the court when Lester filed his post-trial motion alleging that the court had erred in not ordering a severance. Generally, a motion for severance of jointly indicted defendants must be made before trial (*People v. Precup* (1977), 50 Ill. App. 3d 23, 365 N.E.2d 1007), although a trial judge has a continuing duty to grant such a motion if prejudice appears during the course of the trial (*People v. Clark* (1979), 71 Ill. App. 3d 381, 389 N.E.2d 911). The issue of prejudice

cannot, however, be raised for the first time by post-trial motion, and a failure to move for severance forecloses any claim of prejudice on appeal. *People v. Appold* (1976), 39 Ill. App. 3d 814, 350 N.E.2d 511.

Lester contends, however, that under *People v. Wheeler* (1970), 121 Ill. App. 2d 337, 257 N.E.2d 587, the court had an obligation to order a severance *sua sponte* when, as here, the court was apprised before trial of the potential prejudice to Lester resulting from a joint trial. (See *People v. Stevenson* (1980), 90 Ill. App. 3d 903, 413 N.E.2d 1339.) In *Wheeler* the court was advised before trial that a codefendant had made a statement that implicated the defendant and would greatly prejudice him at trial. Defendant's attorney, however, failed to request a severance after the court denied a motion to suppress the statement. The appellate court reversed the defendant's conviction and remanded the cause for a new trial, reasoning that the trial court had a duty to order a severance *sua sponte* in light of the "serious prejudice" which resulted to the defendant from failure to sever.,

■■ *Wheeler* appears to be the only Illinois case imposing such a duty on a trial judge, and even under *Wheeler*, severance would have to be made prior to trial due to the serious double jeopardy problems that would result if a trial court were to order a severance during the course of a trial without a motion requesting one. (See *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227; *People v. Wilhoyt* (1980), 87 Ill. App. 3d 539, 409 N.E.2d 162.) Thus, the holding of *Wheeler* does not apply to a situation such as the one at bar where the need for severance is not apparent prior to the commencement of trial. (*People v. Precup* (1977), 50 Ill. App. 3d 23, 365 N.E.2d 1007.) Here, Lester's counsel indicated before trial that a motion to sever would be premature at that time. When the statement complained of was subsequently introduced at trial, the court was under no obligation to order a severance in the absence of a motion by defendant, and we find no error in its failure to do so.

■■ Lester's alternative argument that his counsel's failure to raise properly the issue of severance constitutes ineffective assistance of counsel is likewise without merit. In order to establish ineffective assistance of counsel, a defendant must show that counsel was actually incompetent and that this incompetence produced substantial prejudice to the defendant, without which the result of the trial would probably have been different. (*People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203.) In this case, the trial court could properly have denied a motion for severance even if one had been made because LaVerne's statement was not of such a prejudicial nature as to render a fair trial impossible in the absence of a severance. See *People v. Davis* (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.

The substance of LaVerne's statement, as related to the jury by Agent

Bivens, was that LaVerne knew the decedent but had not seen him in the last two or three days and that he and his brother had been hunting the day of the murder and had fired a shotgun a couple of times. LaVerne stated that he did not own a .20-gauge shotgun but instead owned a .16-gauge shotgun. Lester asserts that, because the defendants were closely associated by the rest of the evidence as well as by LaVerne's statement, which referred to Lester explicitly, LaVerne's statements that he had not seen the decedent recently and that he did not know anything about the shotgun were antagonistic to Lester's defense that he and his brother had come upon the wounded decedent and had then gone to seek aid.

■■ LaVerne's statement, however, did not implicate Lester in the sense of attributing the commission of the offense to him and is, at most, merely contradictory of Lester's defense rather than antagonistic to it. (See *People v. Davis*; *People v. Precup* (1977), 50 Ill. App. 3d 23, 365 N.E.2d 1007.) While a severance should be granted where the defendants' defenses are so antagonistic that severance is the only way of assuring a fair trial (*People v. Canaday* (1971), 49 Ill. 2d 416, 275 N.E.2d 356; *People v. Davis*), a severance is not mandated by the mere fact that a codefendant's statement is contradicted by evidence introduced at trial. (See *People v. Holman* (1976), 43 Ill. App. 3d 56, 356 N.E.2d 1115; *People v. Precup*.) In *People v. Holman* a statement to police by one defendant differed from the evidence introduced at trial on the question of time. The court held that since the statement did not implicate any defendant in the commission of the offense, the fact that the credibility of the statement was attacked did not render it incriminating and it was thus not error to deny a motion for severance.

■■ We likewise find that the statement at issue here was not sufficiently incriminating to require a severance. Indeed, LaVerne's statement was potentially helpful to Lester's defense in that it provided the only refutation of a key element of the State's case—Dawn Thurman's identification of the defendants as the two men who left to go hunting with the decedent on the morning he was killed. Thus, counsel cannot be branded as ineffective where his motion to sever would have been futile (*People v. Pangburn* (1976), 41 Ill. App. 3d 781, 354 N.E.2d 152) and where his failure so to move was conceivably a viable trial strategy. (*Cf. People v. Wheeler*, where the court's reversal appears to be premised in part on counsel's ineffectiveness in failing to move for a severance when this decision could not possibly have benefited his client.) Finally, because LaVerne's reference to Lester was not a crucial link in the State's case against Lester, which consisted of testimony as to events surrounding the incident as well as substantial physical evidence, it cannot be said that the result of the trial would have been different had a severance been

granted. (See *People v. Jones* (1980), 82 Ill. App. 3d 386, 402 N.E.2d 746.) We hold, therefore, that Lester was not denied effective assistance of counsel when his attorney failed to request a severance at trial.

Affirmed.

KARNS, P. J., and WELCH, J., concur.