THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES CAMPBELL, Defendant-Appellant.

Second District Nos. 2—83—0397, 2—83—0398 cons.

Opinion filed August 13, 1984.—Rehearing denied September 19, 1984.

1030

Dennis M. Doherty, of Chicago, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Sally A. Swiss, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Charles Campbell, and two codefendants, Maverick and Sammie Tyler, were charged in Lake County by indictment for an incident which occurred on September 15, 1982, with two counts of armed robbery, and with one count each of attempted murder, aggravated battery (while armed with a dangerous weapon), and armed violence (caused great bodily harm while armed with a dangerous weapon). (Ill. Rev. Stat. 1981, ch. 38, pars. 18—2, 8—4(a), 9—1(a)(1), 12—4(b)(1), 12—4(a) and 33A—2.) (No. 82 CF 1492.) The defendant was tried separately, and is the only one involved in these appeals. He was convicted by a jury of all counts except attempted murder. Concurrent sentences of 10 years for aggravated battery, 60 years for armed violence and 60 years for armed robbery were im-

posed. Upon defendant's stipulation to those convictions, the court revoked a four-year probation term entered February 23, 1982, after defendant pleaded guilty to an information for the September 15, 1981, robbery of Brian Brady, a sailor, in North Chicago. (No. 81 CF 1519.) The court imposed a seven-year sentence for that robbery, and ordered the concurrent sentences imposed in No. 82 CF 1492 be served consecutive thereto. Defendant's notices of appeal from his convictions and the probation revocation were timely filed, and we have consolidated them.

The sufficiency of the proof against the defendant is not at issue, and a detailed recitation of the evidence at trial is not warranted. The five offenses charged against the defendant in the indictment occurred during the armed robbery of two sailors, Kenneth Kleinworth and Joseph Dindlebeck, who were stationed at Great Lakes Naval Center in North Chicago. September 15, 1982, was payday for the two men. They were returning to base about 10:30 p.m., walking southbound on Sheridan Road. As they approached the viaduct near 19th Street, they noticed three black men at the top of the viaduct by the Elgin, Joliet & Eastern Belt Line railroad tracks. One of the men was holding what Kleinworth and Dindlebeck thought was a stick. They soon realized the stick was a sawed-off shotgun when the three men ran down the tracks toward them and announced a robbery. The defendant was identified at trial as the gunman by Dindlebeck and Kleinworth. Shortly after the incident they had each picked out his photo from police photo albums, and Dindlebeck was able to identify him in a lineup. Kleinworth was not able to pick defendant out of a lineup, and before he identified the defendant in court he asked to be allowed to approach the defendant for a "closer look" and asked to have him stand up. He then stated: "Yes, that's him."

Two of the robbers jumped Dindlebeck, and the defendant repeatedly jabbed at Kleinworth with the gun, prodding him toward the bushes and saying he was "going to blow [him] away, if [he] didn't move." After what seemed like four minutes to Kleinworth, and only a matter of seconds to Dindlebeck, a shot was fired that hit Kleinworth in the upper inside of his left thigh. Kleinworth testified the defendant "rolled me up enough where he could get to my wallet," took it, and fled. Dindlebeck testified a second shot was fired as the robbers ran.

Kleinworth suffered extensive soft tissue injury to his left thigh. He underwent six-hour emergency surgery to restore blood flow to the lower part of his leg and had an artificial blood vessel implanted in his leg. The surgeon testified Kleinworth had lost 50 to 70% of

his functional strength and enervation of his lower leg. The functional disability rendered him unable to perform his duties required on board a ship (climbing ladders, etc.), and proceedings for his discharge from the Navy were instituted. Further surgery was required to relieve symptoms of a pain syndrome he later developed called causalgia.

The defense presented at trial was mistaken identity and alibi. Two witnesses, also sailors, testified for the defense that they were robbed earlier the same evening by a group of four or five black males in approximately the same vicinity as Kleinworth and Dindlebeck. One of the men in that robbery also carried a sawed-off shotgun. Both sailors testified they did not recognize the defendant as one of the men who robbed them.

Ethel, H.T., and Brenda Tyler testified concerning the defendant's whereabouts on the evening of September 15, 1982. The witnesses were, respectively, the mother, father and sister of the defendant's co-defendants. Additionally, Brenda was identified at trial as defendant's common-law wife and the mother of his three children. Mr. and Mrs. Tyler testified they saw the defendant at their daughter's residence at 1801 Victoria, but not at any time later than 6 p.m. on September 15. Brenda testified the defendant was at her residence all day on the 15th; she stated she and the defendant just "sat around" in the evening; she went to bed about 11 p.m., and the defendant went to bed "after twelve."

On cross-examination, the State sought to impeach her testimony with evidence of her prior inconsistent statement to North Chicago Detective Van Dien that the defendant and her brother, Sammie Tyler, were on the back porch all night on September 15, and that she went to bed between 10 and 11 p.m.

As noted, the jury found the defendant guilty of all of the offenses charged, except attempted murder.

The defendant raises several issues with numerous subissues. The primary issues raised are: (1) whether he was denied a fair trial by (a) commencement of the trial and composition of the jury; (b) prosecutorial overreaching; (c) court's evidentiary rulings; (d) police testimony; (2) whether the sentences imposed are excessive or improper; (3) whether reversal and/or remand of the 82 CF 1492 convictions would mandate vacation of the probation revocation.

### 1. FAIR TRIAL

(A) Commencement of the trial and composition of the jury. The defendant contends (1) it was error for the court to deny a mistrial

requested after a week-long delay of trial due to the illness-related absence of the trial judge; (2) two jurors were improperly excused after jeopardy had attached; (3) his right to be present at every critical stage of the trial was violated by the court's excusal of the two jurors out of his presence; (4) his right to have the trial completed by a particular tribunal was violated by the court's excusing of the two jurors; (5) he was prejudiced by the court's refusal to withdraw a juror who admitted on the third day of trial that she could not be impartial; and, as a result of the foregoing, (6) reversal is mandated and reprosecution is barred by the double jeopardy clause or, alternatively, he is entitled to a new trial.

Prior to adjournment on February 7, 1983, the jury here had been sworn, opening statements made, and one witness had testified concerning what he observed when he drove past the scene of the robbery on the evening in question. Due to the illness of the trial judge, Harry D. Strouse, Jr., trial did not resume until February 14, 1983. In the interim, two of the jurors were excused by another judge, Chief Judge Jack Hoogasian, and the two alternate jurors were seated, all without notice to or knowledge of the defendant. Defendant's motions for a mistrial and for the post-trial grant of an evidentiary hearing as to the circumstances surrounding the excusing of the two jurors were denied.

Defendant argues it was an abuse of the court's discretion to deny a mistrial under these circumstances, since it could reasonably be inferred that the other 10 jurors may have resented having to remain on the jury and may have harbored animosity toward the defendant as a result. The defendant cites no Illinois cases in support of his advancement of the proposition that the illness of the judge has long been deemed a proper basis for the granting of a mistrial. He does cite four cases from other jurisdictions which, as explained below, show only that a mistrial may be declared due to illness.

The State responds the defendant's argument here is based on speculation which has no foundation in the record, and is belied by the fact no other jurors sought to be removed from the panel.

■ The decision to declare a mistrial rests within the discretion of the trial court and is not subject to review unless there has been an abuse of that discretion. (*People v. Chaffin* (1969), 115 Ill. App. 2d 1, *rev'd on other grounds* (1971), 49 Ill. 2d 356.) The party moving for a mistrial bears the burden of making a showing that he has been prejudiced (*People v. Robinson* (1979), 68 Ill. App. 3d 747, 753; *People v. Dolgin* (1953), 415 Ill. 434, 445) which, in turn, makes the declaration of a mistrial manifestly necessary or consistent with the ends of jus-

tice. *People v. Bracy* (1973), 14 Ill. App. 3d 495.

The cases cited by the defendant from other jurisdictions support his position on this issue only to the extent that the illness of the court has been recognized, *inter alia*, as an exception to the general rule that a person may not twice be put in jeopardy for the same offense. In such cases of illness of the judge, the trial may be suspended for a time or discontinued altogether due to the necessity of the situation. However, the defendant, even though he may not have consented to the suspension or termination, will not thereafter be protected from another trial upon the same indictment. See *Commonwealth v. McCormick* (1881), 130 Mass. 61, citing *Nugent v. State* (Ala. 1833), 4 Stew. and Port. 72; accord, *State v. Richardson* (1896), 47 S.C. 166, 25 S.E. 220; *State v. Slorah* (1919), 118 Me. 203, 106 A. 768.

Defendant's claim that the court erred in not granting a mistrial must fail on the basis of the record alone. From the following colloquy, it appears defense counsel was presented with a choice of three options, yet he opted to keep the case before Judge Strouse:

"MR. DOHERTY [Defense counsel]: Judge, for the record, I want to make a motion for a mistrial. I want to make a motion for mistrial, Your Honor, based on the unfortunate illness of the Court. The jury has been sitting for a week. I was under the impression they offered me a mistrial last Thursday, with the proviso that the case would be transferred to Hoogasian. I understand the confusion apparently is mine.

THE COURT: I think the problem was, when I got sick, when I talked to Mr. Briscoe, I told them it would seem to me there were three options, one is to grant a mistrial and start over, one is to continue the case before Judge Hoogasian, and of course, the other is just to wait until I came back.

MR. BRISCOE [Assistant State's Attorney]: And I thought I had expressed all three of those.

THE COURT: He said he had talked with you and given the options, and the jury was here, and, it is now 10:20, and we have been ready to go since 9:30 on this case.

MR. DOHERTY: I don't see any serious prejudice.

THE COURT: Period."

■ Defendant has made no showing here that he was prejudiced by the trial judge's unfortunate absence due to illness. He has merely speculated that the jury must have resented the fact it had to continue to serve beyond the usual week-long term. The record reasonably suggests the decision to wait was defendant's, and he may not

now complain of his own choice.

■ The State argues defendant's failure to timely object has waived consideration of his related contention of impropriety due to elicitation of an answer by the prosecutor that a witness was "staying at a hotel downtown, on the [defense attorney's] expense" during the week-long hiatus. In support, the State cites *People v. Lucas* (1981), 88 Ill. 2d 245, and we agree that the defendant has waived this point for failure to object. Also, as the State notes, the question was not improper because the prosecution was entitled to probe the issue of the witness' bias or motive for testifying.

The next points raised by the defendant stem from the discharge of regular jurors and the substitution of two alternate jurors therefor. Defendant complains this was error since it was done by a judge other than the trial judge, that he was not present at the time of the discharge, that his right to have a particular tribunal decide his fate was violated, and that he was "clearly prejudiced" by the discharge of the two jurors.

■ Defendant appears to suggest error in the excusal of the two jurors by "some" judge other than the trial judge, thereby implying a lack of authority in the other judge. However, the statute which permits a regular juror to be replaced by an alternate does not specify this may only be done by the trial judge. (Ill. Rev. Stat. 1983, ch. 38, par. 115—4(g).) Further, it is well settled that a court, and not an individual judge, has jurisdiction over a case. (*In re Marriage of Ayers* (1980), 82 Ill. App. 3d 164, 167.) Although once trial has begun, a party is entitled to the judgment of one judge until the jury retires to consider its verdict (*People v. Moon* (1982), 107 Ill. App. 3d 568, 574; *People v. Mays* (1962), 23 Ill. 2d 520), the substitution of two alternates for regular jurors was not a motion or matter that required any personal knowledge of the case on the part of the judge. Consequently, the mere fact a judge other than the trial judge excused the jurors is not error. *Cf. Huwe v. Commonwealth Edison Co.* (1975), 29 Ill. App. 3d 1085 (judge substituted for trial judge after jury retired to consider its verdict had authority to exercise discretion as to how long the jury should be kept in deliberation).

Defendant further suggests the excusal of the two jurors was an abuse of discretion which prejudiced him because it removed from the jury one juror, a police officer, whom the defendant felt might have been "favorably disposed to his fate," citing *Arizona v. Washington* (1978), 434 U.S. 497, 503, 54 L. Ed. 2d 717, 727, 98 S. Ct. 824, 829.

Although the State acknowledges the truth of defendant's assertion that a court may not arbitrarily substitute an alternate juror over

defendant's objection (*People v. Payton* (1971), 2 Ill. App. 3d 693), it points out the judge here cannot be held to have acted arbitrarily where it was the jurors themselves who asked to be excused. *Cf. People v. Huston* (1977), 46 Ill. App. 3d 170 (when someone other than the court requests the dismissal of a juror, the court has authority to grant or deny the request).

■ We believe the judge did not act arbitrarily in excusing the two jurors. The record shows the jurors called the chief judge, Jack Hoogasian, said they were only told they would have to serve a week and, due to the trial judge's illness and consequent delay, they could not serve during the second week. The court observed that an evidentiary hearing likely would not have generated any more details which might have indicated a different decision should have been made and, in fact, the court observed that had that judge denied the jurors' request to be excused, such denial might have precipitated the opposite claim of prejudice: that the jurors were kept under duress which would cause them to be hostile to the defendant. The record also shows the defendant's motion for an evidentiary hearing was not filed until the day the post-trial hearing was held. Consequently, the defendant's request for an evidentiary hearing was not timely. Accordingly, no abuse of the court's discretion is evident.

Defendant asserts he was denied his absolute right to be present at every stage of his trial affecting substantial rights because the court excused the two regular jurors in his and his attorney's absence. Three cases cited by him in support of his position that he had the right to be present are inapposite. In both *State v. Smith* (1890), 44 Kan. 75, 24 P. 84, and *Upchurch v. State* (1896), 36 Tex. Crim. 624, 38 S.W. 206, the jury was discharged and defendant once again placed in jeopardy upon a new trial, and in *Henderson v. Lane* (7th Cir. 1980), 613 F. 2d 175, *cert. denied* (1980), 446 U.S. 986, 64 L. Ed. 2d 844, 100 S. Ct. 2971, an alternate juror who had been dismissed after the jury retired to deliberate was reinstated in defendant's absence and over his counsel's objection when one of the regular jurors suffered a heart attack after 2½ hours of deliberation. Notably, the petitioner in *Henderson* did not dispute that the trial court generally may substitute an alternate for a regular juror should cause arise during trial, *without first consulting the defendant or his counsel*. Petitioner's concession in this regard was attributed to the fact that alternates are subject to the same selection procedure as the regular jurors. After citing two cases as basic source material, *United States v. Garafolo* (7th Cir. 1967), 385 F. 2d 200, *vacated on other grounds* (1968), 390 U.S. 144, 19 L. Ed. 2d 970, 88 S. Ct. 841, and *United States v. Houli-*

*han* (2d Cir. 1964), 332 F. 2d 8, *cert. denied* (1964), 379 U.S. 828, 13 L. Ed. 2d 37, 85 S. Ct. 56, the court in a footnote expressed its opinion that it is more likely the right to have a trial completed by a particular tribunal is preserved, not endangered, by the use of an alternate juror no matter at which point the substitution occurs.

In *People v. Huston* (1977), 46 Ill. App. 3d 170, the court's *ex parte* replacement with an alternate juror of a regular juror who asked to be excused for an important business meeting was upheld despite defendant's contention the substitution was arbitrary and in violation of his right to be present at all stages of the trial. Although the court expressed its belief that the "better procedure" would have been to call in both attorneys, it noted that the defendant failed to show any prejudice as a consequence of the substitution, and found the trial judge was within his discretion in acting as he did. (46 Ill. App. 3d 170, 172.) Whether defendant was present or not, the replacement of a regular juror with an alternate juror was a matter solely within the discretion of the trial court. Defendant's presence or lack of it was not a factor likely to have an effect on the court's decision; therefore, although perhaps "better procedure" would have called for it, defendant's presence was unnecessary. (See *People v. Harvey* (1981), 95 Ill. App. 3d 992, 998.) Defendant has not shown prejudice as the result of the absence which would require reversal. 95 Ill. App. 3d 992.

Defendant's claim he was prejudiced because one of the regular jurors was a policeman whom he strategically wished to have included on the jury is not sufficient to warrant reversal. As the State argues, the defendant's right to a fair and impartial jury does not translate to a right to have a particular juror included on the panel (*People v. Nicholson* (1978), 61 Ill. App. 3d 621), nor is his right to have his trial "completed by a particular tribunal" abridged by the replacement of two regular jurors with two alternate jurors. The defendant cannot deny that he participated in the *voir dire* of the alternates, nor that he accepted them even though his peremptory challenges had not been exhausted. In such instances, the presumption arises the defendant believes those selected are fair and impartial triers-of-fact. (*People v. Cunningham* (1970), 123 Ill. App. 2d 190.) *Arizona v. Washington* (1978), 434 U.S. 497, 54 L. Ed. 2d 717, 98 S. Ct. 824, and a case quoted therein, *United States v. Jorn* (1971), 400 U.S. 470, 27 L. Ed. 2d 543, 91 S. Ct. 547, both cited by the defendant, lend him no support on this point because mistrials were declared in those cases and the entire jury was discharged. Consequently, at issue there was the constitutional protection afforded the defendant against

double jeopardy, which protection the court considered also embraced his " 'valued right to have his trial completed by a particular tribunal.' " (*Arizona v. Washington* (1978), 434 U.S. 497, 503, 54 L. Ed. 2d 717, 727, 98 S. Ct. 824, 829.) In contrast, no mistrial was declared here, and the defendant participated fully in the choice of all the jurors, including the two alternates. He cannot now claim that the jurors who were acceptable as alternates are not now equally as acceptable to him as regular jurors. The jury which returned the verdicts against him was "the particular tribunal" which he chose.

■ Defendant's next specific contention is that the court erred by not declaring a mistrial when one of the jurors, Mrs. Orsini, reported in chambers that the husband of Essie Collins, defendant's mother, worked for Orsini's husband at Moorhead & Sons. Mrs. Collins had been called as a witness on behalf of the defendant. He points out the judge asked Orsini if the fact of that relationship would influence her in the case, and that she responded: "Oh, yes, yes, yes. I mean, that all, all of the relatives have worked for my husband at one point or another." Although the State claimed Mrs. Collins was a "surprise" witness to them, the record shows her name included on the amended list of defendant's witnesses. However, her name was not among those potential witnesses announced by the court during *voir dire* for the purpose of finding out if any of the witnesses were known to the prospective jurors. Neither did the court mention the name of the father of the codefendants, H. T. Tyler, who was also shown on the amended list, and who was a witness for the defendant at trial. Defendant, although present at the time the court read the names of the potential witnesses, both in person and by counsel, did not bring these omissions to the court's attention. Consequently, Mrs. Orsini was "shocked" when Mrs. Collins took the stand. However, Mrs. Orsini said she did not mention the fact of her acquaintance to any other jurors.

Defendant contends a mistrial was the only remedy in this instance since the usual response to such a problem—replacement with an alternate juror—was foreclosed by the court's earlier substitution of the two alternates. Defendant argues that the impartiality required of a juror is not only freedom from bias *against* the accused and *for* the prosecution, but also freedom from bias *for* the accused and *against* the prosecution. (*People v. Hamilton* (1981), 100 Ill. App. 3d 942.) The State argues the court's denial of a mistrial must be upheld because the defendant has failed to meet the burden of showing that an opinion had been formed in the juror's mind which raises a presumption of partiality. (*People v. Cole* (1973), 54 Ill. 2d 401.) Further,

the State argues Orsini's agreement to be a good and impartial juror allows her to be considered impartial. *People v. Kavinsky* (1980), 91 Ill. App. 3d 784.

Defendant replies that Orsini's response that she would be "influenced" in the case is an admission of bias which necessitates a new trial. In support, he cites *People v. Witte* (1983), 115 Ill. App. 3d 20. He construes that Orsini's signature on the guilty verdict belies any suggestion that she was partial toward the defendant.

The defendant has not met his burden of showing that an opinion had been formed in Mrs. Orsini's mind which rendered her less than impartial. The only inference to be drawn from the initial colloquy in chambers was that Mrs. Orsini would be favorably disposed toward the defendant. Defense counsel, therefore, stated he would be "willing" to take a mistrial. The judge, however, asked the assistant State's Attorneys what they wished to do, and they decided the court should go forward with the proceedings, with the request the court admonish Mrs. Orsini that neither sympathy nor prejudice should enter into her deliberations. Later, during the post-trial hearing, defense counsel argued Orsini's knowledge of the defendant's family, even if it could be assumed that caused her to be favorable to the defendant, might have caused a reverse effect instead: disposition against the defendant, so that she could not later be accused of bias in his favor. The defendant also stated there that Orsini's knowledge of defendant's family meant that she was aware that his family had a criminal record for robbing sailors. In its argument at the post-trial hearing, the State argued the Orsini problem was precipitated by defendant's own negligence in failing to show defendant's mother as a potential witness in his discovery answer. Mrs. Collins was listed on defendant's amended list of witnesses; however, defendant failed to correct the court's omission of both Mrs. Collins and Mr. Tyler in announcing the proposed witnesses to the prospective jurors. Defendant's post-trial motion alleged it was error for the court to refuse to declare a mistrial and grant a new trial due to Orsini's "acquaintance" with defendant's mother since she stated this would "influence" her.

■ It has been held that a defendant may not complain of an error which he himself precipitated (*People v. Harris* (1982), 104 Ill. App. 3d 833, 839; *People v. Riley* (1964), 31 Ill. 2d 490), nor may he sit idly by witnessing a situation about which he might have justly complained and fail to act until verdict has been returned and judgment entered. (*People v. Seidel* (1975), 33 Ill. App. 3d 901.) As stated in *People v. Cole* (1973), 54 Ill. 2d 401, 413-14:

"The burden of showing that the juror possesses a disqualify-

ing state of mind is on the party challenging the juror. 'Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside. \*\*\*' *Reynolds v. United States* 98 U.S. 145, 157, 25 L. Ed. 244, 247; *Irvin v. Dowd* 366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639.''

No one asked Mrs. Orsini in what way she felt she would be influenced by Mrs. Collins' appearance as a witness. The comment was ambiguous, and even defense counsel could only speculate whether she was influenced for or against the defendant. As noted in *People v. White* (1980), 88 Ill. App. 3d 788, 791: "The mere suspicion of bias in a juror is insufficient to impeach a verdict." However, as further noted in *People v. Witte* (1983), 115 Ill. App. 3d 20, 30:

"It is \*\*\* incumbent on the movant to introduce or to offer in support of the new trial motion distinct evidence of partiality by affidavit or juror testimony. (See *Glasser v. United States* (1942), 315 U.S. 60, 87, 86 L. Ed. 680, 708, 62 S. Ct. 457, 472.) In all cases, the allegations must be sufficiently specific, detailed, and nonconjectural so that the fact of prejudice is raised; but any doubt should be resolved in favor of granting the evidentiary hearing. *McCoy v. Goldston* (6th Cir. 1981), 652 F.2d 654, 657, 659."

At trial, defendant here apparently believed Orsini was prejudiced in his favor since he was "willing" to take a mistrial in contemplation, no doubt, of an objection to Orsini by the State. No objection was made, however, and no evidence of Orsini's actual bias was developed on the record. Defendant's post-trial motion made no specific allegations of Orsini's partiality, nor was his motion supported by affidavit, nor was an evidentiary hearing on Orsini's bias requested; defendant's only claim was that a mistrial should have been granted.

In denying the post-trial motion, the court noted that Orsini said she "would be able to do her duty in this job, regardless of her feelings about the family and she could be fair and impartial." This distinguishes the instant case from a case cited by defendant, *United States v. Baca* (10th Cir. 1974), 494 F.2d 424. In that case, no error was found in the removal of a juror after trial had commenced where the court had no recourse but to excuse the juror from further jury service where she unequivocally stated that she could no longer hear and decide the case fairly and impartially.

■ The determination of the impartiality of a juror rests within the sound discretion of the trial court, and will not be set aside unless it is against the manifest weight of the evidence. *People v. Kavinsky*

(1980), 91 Ill. App. 3d 784, 795.

Mere suspicion of bias is not evidence. (*People v. Cole* (1973), 54 Ill. 2d 401, 415.) It was noted in *Smith v. Phillips* (1982), 455 U.S. 209, 217, 71 L. Ed. 2d 78, 86, 102 S. Ct. 940, 946:

> " '[T]he appropriate safeguard against [influence precluding a fair trial] is the defendant's right to demonstrate that the [influence in question] compromised the ability of the [juror] to adjudicate fairly.' [*Chandler v. Florida* (1981), 449 U.S. 560, at 575, 66 L. Ed. 2d 740, 101 S. Ct. 802]."

The defendant here failed to make such a demonstration. Moreover, the relationship between the juror and the defense witness here was not so close as to require her removal simply out of considerations of fairness. The facts here are readily distinguished from those in the case cited by the defendant, *Marcin v. Kipfer* (1983), 117 Ill. App. 3d 1065. In that case, the court reversed and remanded the cause on appeal by the plaintiff from a judgment against the defendant doctor in a negligent treatment suit. The basis for the reversal was the court's error in denying plaintiff's challenge to two jurors for cause. The defendant doctor was presently the personal physician of both jurors. Despite the fact that both jurors had testified there was nothing in the relationship that would make it difficult for them to serve as jurors in the case, the appellate court observed that in order for them to find for the plaintiff, they would have had to find their personal physician to have been incompetent in the treatment of the decedent. The court found there was still considerable strength in the traditional close relationship of trust and confidence between patient and physician, and that fairness required the jurors to be discharged.

In contrast here, it was evident Orsini did not know the defendant was Collins' son until Collins was called to the stand. Nor does the record indicate who "all the relatives" were who worked for Orsini's husband. Further, it appears Orsini's husband was Collins' husband's superior rather than vice-versa. This would tend to negate the existence of any feeling on Orsini's part that she might somehow jeopardize her husband's employment by returning a guilty verdict against the defendant.

In sum, we conclude the court's decision not to remove Orsini and declare a mistrial was within its discretion and was not against the manifest weight of the evidence.

■ Defendant's final point in regard to the jury is that the court's conduct in excusing the two regular jurors and substituting the two alternates amounted to a judicially induced mistrial barring reprosecution. This argument hinges on the prerequisite finding that

juror Orsini should have been excused for bias and, since the court had already used the two alternate jurors to replace the regular jurors—which defendant also claims is error—the only alternative available to the court would be to declare a mistrial. Under such circumstances, the defendant asserts retrial after a reversal would be barred, since the removal of the two jurors was without "manifest necessity" and "over the defendant's objection" and was tantamount to a judicially induced mistrial. In primary support he cites *People v. Payton* (1971), 2 Ill. App. 3d 693, *United States v. Evers* (5th Cir. 1978), 569 F.2d 876, *United States v. Jorn* (1971), 400 U.S. 470, 27 L. Ed. 2d 543, 91 S. Ct. 547. Alternatively, for the same reasons, he argues he is entitled to a new trial.

The State finds *Payton* inapposite in view of the fact the jurors here were removed at their own behest, not as a result of an arbitrary exercise of judicial discretion which would bar reprosecution. (*Cf. People v. Huston* (1977), 46 Ill. App. 3d 170 (when someone other than the court requests the dismissal of a juror, whether the request is from a member of the jury or from counsel for either party, the court has authority to grant or deny the request).) Also distinguishing *Payton* is the fact the juror, who discovered he was employed by the brother of the complaining witness after that witness testified, had been examined by the court and it had determined the relationship of the juror and witness was not so close, and that the juror could and would be fair to both sides. Consequently, without the defendant's consent, the court could not discharge the juror and substitute an alternate without risking a subsequent double jeopardy claim. (*People v. Payton* (1971), 2 Ill. App. 3d 693, 697-98.) As previously discussed, the court's excusal of the two jurors was for the reason they could not attend court the second week. The defendant not only had no say in whether or not the jurors should be excused but, in fact, that they needed to be excused at all was at least in part the result of the defendant's apparent decision not to transfer the cause to another judge or have a mistrial declared when Judge Strouse became ill. Also, as concluded above, Mrs. Orsini's retention on the jury was not error.

The double jeopardy issue next raised by the defendant need not be addressed since no reversal is warranted on any of the bases asserted above by the defendant.

(B) *Prosecutorial overreaching.* The defendant contends he was denied a fair trial due to prosecutorial overreaching in that defense witness Ethel Tyler, mother of the defendant's codefendants, was questioned on cross-examination about her son Sammie's ownership of

a sawed-off shotgun. Before Mrs. Tyler testified, the court had limited the co-prosecutors' cross-examination of the Tyler family witnesses to the extent that "they can bring out [Sammie and Maverick Tyler] are defendants, but that is the end of it."

During cross-examination, the prosecutor asked Mrs. Tyler: "And that conversation [with the police the day after the defendant was arrested], do you remember telling the police that your son, one of your sons, did, or had in fact owned a sawed-off shotgun?" Defendant immediately moved for a mistrial, and the prosecutor argued the defendant had "opened the door" by asking Mrs. Tyler if she had a conversation with the police. The court sustained the "objection," asked the jury to disregard the question, took the mistrial motion under advisement, and later denied it.

On curative redirect, defense counsel elicited testimony that neither of Mrs. Tyler's two sons had ever been in the penitentiary or arrested before, they were arrested seven days after the defendant, neither one had ever been in a lineup or picked out of a photographic lineup, that Sammie had a gun three or four years ago when he was 21 years old, that the gun had been gotten rid of, and that there had been no gun in her house since then. On re-cross-examination, the prosecutor inquired: "Ok, and it's your testimony now that *you yourself* got rid of that gun?" (Emphasis added.) Mrs. Tyler responded "Yes, sir." The court then called a halt to any more questions about the gun, and Mrs. Tyler was excused.

Defendant argues the only effect of the revelation about the gun was to portray the codefendant as an evil person, worthy of punishment, and the State's motive "was, of course, to impute this sinister fact to the defendant." He contends his motion for a mistrial should have been granted, and that the egregiousness of the prosecutorial overreaching should serve to bar retrial. In support, he cites *People v. Reimnitz* (1981), 97 Ill. App. 3d 946, and a number of the cases cited therein, along with *People v. Pendleton* (1979), 75 Ill. App. 3d 580.

The State argues that even if the prosecutor's question may have violated the court's ruling, very little, if any, prejudice resulted. It finds defendant's reliance is misplaced on the cases he cites with regard to the use of evidence of other crimes since *"per se* possession of a sawed-off shotgun is not a crime" unless the gun has been altered so that the barrel is less than 18 inches. (Ill. Rev. Stat. 1983, ch. 38, par. 24—1(a)(7).) We note the statute on its face indicates that in common parlance a "sawed-off shotgun" is one which has one or more barrels less than 18 inches in length. The State suggests any error was rendered harmless by the court's instruction to the jury to disre-

gard the question, and by defense counsel's questions on redirect examination. The State rejects the contention that retrial would be barred, noting that the court in *People v. Reimnitz* (1981), 97 Ill. App. 3d 946, did not reach the issue whether defendant's conviction should be reversed without remand since there was no showing of deliberate attempt by the prosecutor to deprive the defendant of a fair trial. The State asserts no such showing has been made in this court either, and, if error is found, remand for a new trial would be proper.

 We believe it was error for the prosecutor to inject the shotgun into the defendant's case in this manner; however, the error was harmless, and did not amount to prosecutorial overreaching which would bar retrial in view of the weight of the evidence against the defendant.

 His defense at trial was mistaken identity and alibi, yet Dindlebeck identified him from photographic and physical lineups and in court, and Kleinworth identified him from a photographic lineup and again in court. Two of the defendant's alibi witnesses, Mr. and Mrs. Tyler, were unable to testify to his whereabouts after 6 p.m. on the evening in question, and his common-law wife's testimony was significantly impeached. A conviction will not be reversed simply because the prosecution committed error; it must first be determined that the defendant was denied real justice and that the verdict was the result of the error. (*People v. Medley* (1983), 111 Ill. App. 3d 444, 449; *People v. Lumpkin* (1982), 105 Ill. App. 3d 157, 163.) Further, the court's admonition to the jury to disregard the question "generally relieves substantial prejudice, preserves fairness, and cures any error." (*People v. Lumpkin* (1982), 105 Ill. App. 3d 157, 163-64, citing *People v. Kavinsky* (1980), 91 Ill. App. 3d 784, 797.) Additionally, we note that where inadmissible evidence is received, the defendant may be permitted (*People v. Higgins* (1979), 71 Ill. App. 3d 912)—as he was here—to introduce similarly inadmissible evidence under the concept of curative admissibility in order to counter the effect of the inadmissible evidence. *People v. Wilbert* (1973), 15 Ill. App. 3d 974.

 It is reasonable to conclude that the prosecutor's conduct, although improper, was nevertheless motivated by his desire to place evidence before the jury which would suggest the defendant had access to a shotgun, the weapon which was used to commit the armed robbery at bar, but which the prosecution was not able to produce at trial. When viewed in that manner, the prosecutor's "overreaching" was performed with the intent to secure a conviction, not to provoke a mistrial. The double jeopardy clause protects defendants only

against governmental actions which are intended to provoke a mistrial request (*United States v. Martin* (8th Cir. 1977), 561 F.2d 135, 139; *United States v. Dinitz* (1976), 424 U.S. 600, 611, 47 L. Ed. 2d 267, 276, 96 S. Ct. 1075, 1081); and retrial is barred only where " 'bad-faith conduct by judge or prosecutor,' [citation] *** threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' *** [citations]." (424 U.S. 600, 611, 47 L. Ed. 2d 267, 276, 96 S. Ct. 1075, 1081.) We conclude the prosecutor's reference to the shotgun was not reversible error.

Also with regard to prosecutorial overreaching, the defendant contends that despite its agreement to instruct its witnesses not to refer to the police photograph books as "mug books" or the photos as "mug shots," three of the State's witnesses referred to either a "mug book" or a "mug shot book." Although admitted into evidence, the book was not taken into the jury room. Defendant contends this amounted to reversible error and/or prosecutorial overreaching which, alternatively, would necessitate remand for a new trial or which would bar retrial.

No prosecutorial overreaching with the intent to secure a mistrial is evident on this issue. In *People v. Wright* (1982), 105 Ill. App. 3d 187, the court, citing to *People v. Pendleton* (1979), 75 Ill. App. 3d 580, 593, noted that prosecutorial overreaching is defined as misconduct:

> " 'which is specifically designed to provoke a mistrial in order to secure a second—and perhaps more favorable—opportunity to convict the accused [citations]; or *** which is motivated by bad faith or undertaken to harass or prejudice the accused [citations].' " *People v. Wright* (1982), 105 Ill. App. 3d 187, 189.

In order to constitute prosecutorial overreaching which would bar retrial:

> " '[T]he intent of the prosecutor in overreaching must be to obtain a premature termination of the proceedings by forcing the defendant to move for a mistrial. Unless the prosecutor's misconduct was a ploy to force the defendant to move for a mistrial, and thereby obtain an opportunity to prosecute the defendant a second time, overreaching to obtain a conviction, although not to be condoned, does not itself foreclose reprosecution.' (*People v. Gomez* (1980), 84 Ill. App. 3d 785, 788, 406 N.E. 2d 886, 888.)" *People v. Estrada* (1980), 91 Ill. App. 3d 228, 236.

As the State points out, one of the defenses at trial was mistaken

identity. Thus, inquiry into the process of identification of the defendant by the victims of the offense was an integral part of the prosecution's case. The record shows that after Dindlebeck referred to "mug books," the prosecutor again agreed to instruct his witnesses not to use the terms "mug shots" or "mug book." His surprise was evident when Kleinworth said "mug book" during his testimony, rather than "big book." Obviously, he had discussed the matter prior to Kleinworth's testimony. We note the first two witnesses who used the terms were not police personnel, were most likely not familiar with testifying in a trial, and perhaps did not understand what ramifications the use of such terms might have in a criminal trial. When Detective Van Dien also used the term "mug shot books," no ruling was made on the defendant's objection and, thereafter, the defendant did not object to Detective Van Dien's testimony that he showed Kleinworth photos which were "[i]n a booklet form, it's a polaroid mug shot book of all black males," nor did defense counsel object when Detective Van Dien identified the book by saying "Yes, this is that same black—polaroid mug shot book that I showed Kenneth Kleinworth." Counsel may have considered further objections futile and/or counterproductive at that point. Nevertheless, it may well have evidenced counsel's reluctant surrender to the position taken by the court on the use of the terms "mug shot book" or "mug books"; to-wit:

> "[B]ut as a really practical problem, what difference does it make whether he calls it a mug book, or says he looked through a couple of books with 150 pictures in it? In this day and age, with television being what it is, how are you going to find a juror who doesn't know that is a mug book?
>
> * * *
>
> There is hardly anybody alive that has a television set that doesn't know that when you look at four photographs per page, page after page, you are looking at a mug book. You can't call it a family album, no matter what you do, and I just don't think it's prejudicial."

This court has not been provided with either the books or the photos which were used at trial, and defendant does not make any claim here that they were readily identifiable as "mug shots" or "mug books" due to anything written on the photos or on the books, such as a legend on the photo (*People v. Clark* (1973), 12 Ill. App. 3d 280), the name of a police department, or a date earlier than the date of the offense. *People v. West* (1977), 51 Ill. App. 3d 29, *overruled in People v. Wheeler* (1979), 71 Ill. App. 3d 91.

As stated in *People v. Adams* (1974), 22 Ill. App. 3d 665, 668-69:

"We agree that the introduction of 'mug shots' into evidence can be prejudicial as evidence of other criminal activities. [Citations.] However, 'mug shots' may nevertheless properly be admitted where they are being admitted for the purpose of showing how defendants could have been accurately identified from them and not merely for the purpose of prejudicing the jury by showing prior unrelated encounters with the police. See *People v. Maffioli* (1950), 406 Ill. 315, 94 N.E.2d 191; *People v. Purnell* (1969), 105 Ill. App. 2d 419, 245 N.E.2d 635."

When mug shots tend to prove a fact in issue such as identity, they are admissible as an exception to the general rule regarding evidence of other crimes. (*People v. Hawthorne* (1978), 60 Ill. App. 3d 776, 780; *People v. Denwiddie* (1977), 50 Ill. App. 3d 184.) This court in *People v. Wheeler* (1979), 71 Ill. App. 3d 91, 97, expressed a view on this subject consistent with the trial judge here:

"[W]e must observe that a police photograph or 'mug shot' cannot help from being recognized by the average juror. Such photographs, showing a front view and a profile view, are common knowledge to the public from their exposure to the same in the news media, television, and are on the walls of the vast majority of police stations and post offices throughout the United States. The obliteration of the date, number or police department information cannot help but be obvious to the most casual observer. He or she would most certainly recognize such as a 'mug shot' with or without any legend there. See *People v. Murdock* (1968), 39 Ill. 2d 553, 237 N.E.2d 442."

Similarly, the jurors could not have failed to know the nature of the book from which the victims picked defendant's photo whether it was referred to as a "mug shot book" or not. Certainly the intentional use of the terms "mug shots" or "mug books" is not to be condoned; however, even specific instruction to a witness not to use a certain term cannot guarantee what will issue forth from the witness on the stand under the stress of examination. It may indeed be as naive to expect success from such an instruction as if the witness were told to go into a corner of a room and *not* think about a pink elephant.

In sum, we do not believe the jury's verdict would have been otherwise had the offensive terms not been used. Consequently, the error was harmless (*People v. Warmack* (1980), 83 Ill. 2d 112, 128-29), and no reversal is warranted.

(C) Court's evidentiary rulings. Defendant's first complaint here is

that the court abused its discretion in admitting a "gory" photo of Kleinworth's injured leg. He asserts he did not dispute there was great bodily harm, and there was detailed testimony about the extent of the injury. Consequently, he argues whatever probative value the picture may have had was outweighed by its potential prejudice to the defendant. The State urges this court to strike defendant's argument on this point because he has not provided the court with the photo in question, which it was his burden to do. (*People v. Edwards* (1978), 74 Ill. 2d 1, *cert. denied* (1979), 442 U.S. 931, 61 L. Ed. 2d 299, 99 S. Ct. 2862; *People v. Anderson* (1977), 51 Ill. App. 3d 621.) Alternatively, the State argues its right to prove its case against the defendant included the right to have admitted even gruesome photos as long as they are probative of an issue. (*People v. Campbell* (1979), 77 Ill. App. 3d 804, 817; *People v. Seaberry* (1978), 63 Ill. App. 3d 718, 722-23; see also *People v. Jenko* (1951), 410 Ill. 478.) Further, it argues such photos are admissible even when there is other proof of the issue. *People v. Petersen* (1982), 110 Ill. App. 3d 647; *People v. Speck* (1968), 41 Ill. 2d 177, 202-04, *death penalty vacated* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279.

■ It was the defendant's burden to provide this court with the photo; however, the record itself clearly reveals the photo was properly admitted and the court did not abuse its discretion. The photo was probative of the great bodily harm suffered by the victim, and was also probative of the attempted murder charge against the defendant. Further, the court permitted only one photo of the victim's injury to be admitted. We conclude admission of the photo was within the court's discretion and no reversal is warranted.

■ The defendant's next complaint is that the court erred in precluding the defendant's mother from testifying that no police officer came to her home to make an effort to question or arrest the defendant between September 16 and 29, 1982, nor had anyone called on the phone. He asserts such testimony would have supported his defense of mistaken identity since Kleinworth's "positive" identification of him was made on September 16, yet no warrant for his arrest was issued until 13 days later on September 29.

We agree with the State's argument that this evidence would have been merely cumulative and, thus, was not reversibly excluded. The record clearly shows the defendant asked Detective Van Dien if he ever called, questioned, or picked up the defendant during the time period in question, and that Van Dien responded, "No, I didn't." Defendant asserts this was a "clever response" in that it "clearly implied" some *other* officer or officers had attempted to contact the

defendant.

The only things that would have made that three-word response "clever" would be the witness' voice inflection and demeanor, neither of which can possibly be ascertained by this court on the basis of the "cold record." On its face, however, the record shows the excluded evidence would have been cumulative at best, and its asserted supportiveness of the defense speculative at best. The jury could also have viewed the delay, not as uncertainty of the defendant's identity, but as calculated to avoid tipping off the two other accomplices that the police were on to them until their identities could be established and all three could be arrested simultaneously.

▬▬ The exclusion of evidence is neither prejudicial nor grounds for reversal where the same or substantially the same evidence is admitted at some stage of the trial. (*People v. Wallace* (1981), 100 Ill. App. 3d 424; *People v. Garza* (1981), 92 Ill. App. 3d 723; *People v. Moretti* (1955), 6 Ill. 2d 494, *cert. denied* (1958), 356 U.S. 947, 2 L. Ed. 2d 822, 78 S. Ct. 794.) Defendant suggests in his reply that "substantially the same evidence" was not otherwise received by the jury, and that he wanted to show not only that Van Dien did not contact the defendant, but that no other officers did either.

The substance of the evidence sought to be presented by the defendant was that there was a 13-day delay between his identification by the victim and his arrest by the police. Van Dien testified Kleinworth's positive identification of the defendant was the only thing he relied on in order to secure a warrant for the defendant's arrest, that no warrant was applied for or issued before September 29, and that between September 16 and 29 he neither questioned nor picked up the defendant at his home nor called him on the phone. In our view, testimony that no one else did either would only have cumulated the substance of Van Dien's testimony. Consequently, we conclude the defendant was not prejudiced by this exclusion.

▬▬ Next, the defendant contends it was error for the court to allow the admission of evidence concerning a purported suicide attempted by him after his arrest and placement in a jail cell. Testimony and a photograph showing the condition of the cell (*i.e.*, strips of torn blanket hanging from the jail cell bars) were admitted over defendant's objection. His pretrial motions to suppress and *in limine* were denied. He argues first the evidence is not sufficiently trustworthy or reliable to be considered a suicide attempt, and that it is the court's duty to adopt, if possible, the hypothesis that the circumstances are attributable to an innocent, rather than a criminal, cause. He avers it is just as plausible that what occurred was an escape attempt or mere

vandalism. Alternatively, he asserts that the existing law which allows evidence of attempted suicide as evidence of consciousness of guilt should either be modified, reversed, or not applied to the instant case.

As pointed out by the State, the defendant has failed to provide this court with the photo objected to here. Despite the lack of the photo, there was testimony that blanket strips were hanging from the ceiling bars of the cell, some of the strips were tied together, and that the defendant was found on the floor, yelling about having hit his head. If it was not actually a suicide attempt, it looked enough like one to cause the police officers to remove all of the defendant's clothing after ascertaining there was no injury to him and before he was again left alone in the cell.

The defendant's theory below was either that this evidence should be suppressed on fifth amendment grounds because it amounted to a nonverbal admission by the defendant, or on due process grounds because it would be prejudicial to present the evidence to the jury. Consequently, the defendant may not now argue that the evidence is not reliable or truthworthy enough to be regarded as a suicide attempt, since his suppression theory below depended on its being considered such an attempt; hence, a nonverbal admission of guilt.

Construed either as an escape attempt or suicide attempt, the evidence was probative of the defendant's consciousness of guilt and, thus, was properly admitted. (*People v. Henry* (1982), 103 Ill. App. 3d 1143; *People v. O'Neil* (1960), 18 Ill. 2d 461.) Defendant fails to advance either argument or citation of authority which would persuade this court to disallow evidence of this sort in contravention of what is settled law in Illinois. The probative value of such evidence springs logically from basic considerations of human nature and man's primal instinct for self-preservation.

In sum, we conclude the court's evidentiary rulings were not an abuse of discretion and no reversal is warranted.

(D) Police testimony. Defendant next contends that prejudicial police testimony deprived him of a fair trial. In the first instance, Detective Van Dien was asked whether the defendant had agreed to speak at the time he was arrested. Van Dien answered: "No, he did not want to give a statement in regard to an armed robbery that I had asked him." Defendant contends this amounted to a violation of the rule stated in *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; to-wit: the use for impeachment purposes of a defendant's post-arrest silence at the time of arrest and after *Miranda* warnings are given violates the due process clause of the fourteenth amendment. The court there considered that it would be fundamen-

tally unfair to allow an arrestee's silence to be used to impeach an explanation subsequently given at trial after he had been impliedly assured by the *Miranda* warnings that silence would carry no penalty. 426 U.S. 610, 618, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245.

 The State points out first the defendant did not object to Van Dien's testimony at trial and, therefore, has waived this issue. He did include the point in his post-trial motion, but the issue thus preserved is nonetheless without merit. Van Dien went on to testify that the defendant stated he knew nothing about a robbery, and that he was with "his lady," who would so testify in court. Defendant did not testify at trial, and Van Dien's testimony in no way could have been used for impeachment purposes in contravention of the *Doyle* rule. The defense presented at trial was entirely consistent with the defendant's post-arrest statement, and no due process violation occurred as a result of Van Dien's testimony.

 The next two instances of testimony which defendant asserts prejudiced him were, first, when defense counsel established on cross-examination of Detective Van Dien that the defendant spoke freely with the police. After noting that even though the defendant was advised he had a right to have a lawyer and that the court would appoint one for him if he could not afford one, defense counsel inquired of Van Dien: "But he did not request a lawyer, did he?" Van Dien replied: "No, not at this time." Defendant contends this response made it sound like the defendant had requested a lawyer at a later time, and that observations that a defendant consulted an attorney prior to, or subsequent to, making a statement are prejudicial. In support he cites *People v. Farmer* (1963), 28 Ill. 2d 521. That case, however, is readily distinguished, in that the comments there were made by the prosecutor during closing argument in which he specifically suggested the defendant consulted an attorney so that they could make up some type of a defense rather than having no defense at all at trial. Although found improper, the comments were found not prejudicial where the jury was immediately instructed to disregard the comments. Clearly, the comment here was ambiguous and defense counsel could have requested the qualified portion of Detective Van Dien's answer be struck as nonresponsive, but he did not.

The second asserted error here was Van Dien's answer when he was asked on direct examination:

> "Q. [Prosecutor]: OK, and have you come to learn the identity of the individual who is depicted in that photograph that [Kleinworth] pointed to?"

and he answered:

"A. [Van Dien]: Yes, I knew that was Charles Campbell."

Defendant claims this response improperly implied that he had had prior contact with the police. This point is waived due to the defendant's failure to either object at trial or to raise the issue in his post-trial motion, and no plain error is evident. (*People v. Lucas* (1981), 88 Ill. 2d 245.) Further, notwithstanding that the point has been waived, the issue is meritless. Van Dien could have had knowledge of the defendant's identity for innumerable reasons other than prior police contact.

In sum, no errors singly nor a cumulation thereof amounted to a deprivation of the defendant's right to a fair trial. No reversal or remand is warranted on the basis of any of these points raised by the defendant.

## 2. EXCESSIVE AND/OR IMPROPER SENTENCES.

The defendant contends, alternatively, that his sentences are excessive and should be reduced because they effectively negate any possibility of his rehabilitation and restoration to useful citizenship; that the extended term or terms should be vacated either because the shooting was not premeditated but occurred spontaneously, or because there was no specific finding by the judge as required in section 5—5—3.2(b)(2) of the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(2)); or because an extended term may be imposed only for the most serious offense of which the offender was convicted.

The State concedes it cannot justify the imposition of an extended term for the aggravated battery conviction, but for the reason that the offense was the predicate felony on which the armed violence conviction was based. As such, convictions for both offenses may not stand, and vacation of the conviction and sentence for aggravated battery is warranted in line with *People v. Donaldson* (1982), 91 Ill. 2d 164.

We agree. (See also *People v. Mormon* (1982), 92 Ill. 2d 268.) Although the aggravated battery charge was based on the commission of a battery using a dangerous weapon (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(b)(1)), and the armed violence charge was based on the commission of an aggravated battery which caused great bodily harm (Ill. Rev. Stat. 1981, ch. 38, pars. 33A—2, 12—4(a)), both indictments specified that the act performed was the shooting of Kenneth Kleinworth. Thus, defendant cannot be convicted for both offenses where the same physical act is the basis for both charges. (*People v. Donaldson* (1982), 91 Ill. 2d 164, 170.) Accordingly, the defendant's

conviction and sentence for aggravated battery is vacated.

Defendant acknowledges that *People v. DeSimone* (1982), 108 Ill. App. 3d 1015, holds that extended terms may be imposed for more than one offense when all of the offenses are within the class of the most serious offense committed by the defendant, and all of the offenses for which the extended terms are imposed are accompanied by brutal and heinous behavior indicative of wanton cruelty. Defendant contends, however, that because the court's only finding in this regard made reference to "great and severe bodily injury," the extended term could only be imposed for the aggravated battery offense and not for armed violence or armed robbery.

 Although the defendant's argument here has been somewhat deflated due to the State's concession to the vacation of the aggravated battery conviction for other reasons, the defendant's argument nonetheless highlights the fact that although multiple extended terms may be imposed when all offenses are within the same class of the most serious offense (here, Class X), each of the offenses for which an extended term is imposed must also be "accompanied by brutal and heinous behavior indicative of wanton cruelty." (*People v. DeSimone* (1982), 108 Ill. App. 3d 1015, 1026.) Accordingly, in order to sustain the extended sentences for armed violence and armed robbery, each offense must have been accompanied by behavior indicative of wanton cruelty.

In determining whether each offense was so accompanied, reference must be made to the findings of the court. Defendant's related contention is that the court failed to make the necessary finding required in section 5—5—3.2(b)(2). This failure, he argues, is fatal to the extended portion of the sentences by virtue of the provisions of section 5—8—2(a) of the Code. That section provides:

> "A judge shall not sentence an offender to [an extended term] *** unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present. Where the judge finds that such factors were present, he may sentence an offender to the following: ***." Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a).

The State argues the record belies the defendant's assertion that the court failed to articulate the necessary finding. It points out the State argued this was a proper case for the imposition of consecutive and extended term sentences because the defendant's conduct was particularly brutal and heinous and it was indicative of wanton cruelty. "He didn't merely *** possess a weapon during the course of a robbery. He used it. He used it to the extent that he blew off a young

man's leg, or 70 percent of it." In imposing sentence, the court remarked that the evidence indicated "the wanton shooting of a helpless individual with a gun, which was designed to do tremendous injury, and which did." The court also observed that "but for a very significant action which was taken by people who arrived early, we would be trying the defendant for murder, rather than armed robbery \*\*\*."

In addition to these comments of the court, the evidence itself supports a finding that the defendant's behavior was indicative of wanton cruelty. Kleinworth testified the defendant "put [the shotgun] in my face, and told us if we didn't get up into the bushes to the right, he would blow us away." He further testified "[the defendant] kept prodding me in the gut with the shotgun, and telling me to get over there, or he was going to blow me away." Kleinworth testified that after he was shot, the defendant "bent over and rolled me up enough where he could get to my wallet. \*\*\* He took my wallet and fled."

In an analogous case, *People v. Pittman* (1982), 93 Ill. 2d 169, the court construed the terms of section 5—8—4(b) of the Code, which requires that before a consecutive term may be imposed, the court shall set forth in the record the basis for its opinion that such a term is required. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—4(b).) The defendant there argued the court failed to make the required finding that a consecutive term was required to protect the public from his further criminal conduct. The State argued "a ritualistic recitation" of the statutory language was not required, only that the court set out explicitly an adequate basis for its opinion. The court agreed that failure to ritualistically recite the statutory language would not necessarily require reversal; "[w]hat is required is that the record show that the sentencing court is of the opinion that a consecutive term is necessary for the protection of the public." 93 Ill. 2d 169, 178.

The supreme court in *People v. La Pointe* (1982), 88 Ill. 2d 482, 501, stated:

> " 'Heinous' is defined by Webster's Third New International Dictionary (unabridged) as 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal'; 'brutal' includes 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' "

It is clear here that the court found the defendant's behavior was wanton, and the record fully supports that finding. The defendant's purpose was flagrantly criminal; he demanded the victims' total compliance with his commands or he would "blow them away," as if they were glass bottles on a fence. The defendant's complete indiffer-

ence to the value of human life was vividly illustrated when he rolled the grievously wounded victim, Kenneth Kleinworth, up "just enough" to allow access to his wallet.

■■■ The imposition of a sentence, including an extended term sentence, is a matter of judicial discretion, and absent an abuse of discretion, the sentence of the trial court may not be altered on review. (*People v. Johnson* (1984), 121 Ill. App. 3d 358, 376.) The court's failure to parrot the language of the statute is not fatal to the extended terms imposed, where the record shows the court considered the evidence indicated wanton conduct, and where the evidence does, in fact, reflect such conduct. In sum, no abuse of discretion is evident, and no alteration of the sentence is possible. *People v. Cox* (1980), 82 Ill. 2d 268.

■■■ ■ With regard to the defendant's contention that the sentences are excessive, the judge need not detail the process by which he strikes an appropriate balance between the protection of society and the rehabilitation of the offender; it is enough that the court considered evidence within the statutory framework. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 493.) The trial court's determination is entitled to great weight and deference and will not be set aside in the absence of a showing of an abuse of discretion. (*People v. Cox* (1980), 82 Ill. 2d 268; *People v. Perruquet* (1977), 68 Ill. 2d 149.) In the instant case, the judge noted the defendant's age, his prior record which indicated to the judge that the defendant's crimes were becoming increasingly violent, and the judge considered the evidence, the presentence report, the arguments of the attorneys and the defendant's statement, all prior to imposing sentence. We conclude the court did not abuse its discretion in imposing the length of sentences which it did.

3. VACATION OF SENTENCE IMPOSED UPON REVOCATION OF PROBATION.

In the event of a reversal and/or remandment, the defendant argues the court's order revoking his probation must be vacated because the order revoking his probation was entered upon his stipulation to the instant convictions. Defendant is correct (*People v. Hannah* (1975), 31 Ill. App. 3d 1087; accord, *People v. Lopez* (1979), 72 Ill. App. 3d 713); however, in view of our decision to affirm, this issue is moot.

■■■ The State does not agree, as defendant alternately argues, that his sentences for the instant offenses should run concurrently with, rather than consecutively to, the seven-year sentence imposed upon revocation of the probation for his robbery conviction. This case is distinguishable from the one which defendant cites in support of his

argument, *People v. Johnson* (1982), 104 Ill. App. 3d 572, in that the prior offense here was an entirely separate offense which occurred long before the instant offenses. Upon revocation of probation, the judge is entitled to sentence the defendant to any sentence that would have been appropriate at the time of the original conviction. *People v. Spencer* (1977), 52 Ill. App. 3d 378.

■ Lastly, the State agrees with the defendant's argument that irrespective of the merits of any of the above issues, he nevertheless is entitled to be credited with the time served on probation, since the court did not expressly deny such credit when imposing the seven-year term. We concur. *People v. Hollingsworth* (1982), 89 Ill. 2d 466.

The conviction and sentence for aggravated battery in No. 82 CF 1492 are vacated; the remainder of the judgments of the circuit court of Lake County in Nos. 82 CF 1492 and 81 CF 1519 are affirmed; the defendant is to be credited on remand with the time served on probation in No. 81 CF 1519.

No. 82 CF 1492: Judgments vacated in part and affirmed in part;
No. 81 CF 1519: Judgment affirmed; cause remanded with directions.

SEIDENFELD, P.J., and LINDBERG, J., concur.